## THE WREN.

1. The liability to confiscation, which attaches to a vessel that has contracted guilt by breach of blockade, does not attach to her longer than till the *end* of her return voyage.
2. A vessel condemned below as enemy's property restored by this court; the proofs being of a hearsay and loose character and such as did not rise to the dignity of evidence within the law of that subject. But costs were withheld.

APPEAL from the District Court for the Southern District of Florida, condemning as prize of war the Wren.

The steamship Wren, a merchant vessel, left the port of Havana on the 12th of June, 1865, for Liverpool, *via* Halifax, Nova Scotia, with a crew of about thirty-five persons, who, on the morning of the next day, mutinied, confined the officers in their quarters, carried the vessel into the port of Key West, and delivered her as prize to the acting admiral commanding at that station. The seizure was in pursuance of secret arrangements with the United States consul at Havana, before the vessel left that port. A libel was filed against the vessel by the United States District Attorney, before the judge of the Southern District of Florida, as prize of war. The master, one Stiles, put in a claim in behalf of *John Laird*, a British subject, as owner.

This Stiles had been an officer in the navy of the United States. The record also disclosed this answer of his to the standing interrogatory as to the papers of the vessel:

All the letters and papers of which he has any knowledge of having been on board on the present voyage were taken by the asserted captors with the exception of one letter to himself from the agent of the vessel, Mr. Helms, at Havana, which was *destroyed*, and an order in favor of this deponent from Mr. Helms

for the payment of £40, payable on delivery of the ship at Liverpool.

After hearing the proofs, including those hereafter mentioned, the court condemned the vessel on the ground that she was the *property of the enemies of the United States.* Laird appealed.

In this court it was insisted, that the vessel was liable to be condemned—

1. For breach of blockade on the voyage next preceding that on which she was captured.

2. As being enemies' property.

1. *As respected the breach of blockade.* It appeared that the vessel had been engaged in running the blockade of the port of Galveston, Texas, from the port of Havana, and that a short time before she entered on the present voyage she had successfully entered Galveston, discharged her cargo, and taken on one of cotton, and returned in safety to Havana.

2. *As it respected the ownership.* On the side of the claimant, it appeared from the *registry* of the vessel that the " Wren," her registered name, was a British ship, built at Birkenhead, in Chester County, England, by Messrs. Laird Brothers, in 1864; that she belonged to John Laird, the younger, of Birkenhead, ship-builder, as owner; that William Raisbeck was, at the date of the registry, master of the ship; that Liverpool was her port of registry; and that she was of 267 tons registry tonnage. The registry bore date the 24th December, 1864.

John Duggan, one of the crew examined *in preparatorio*, and who resided in Liverpool, testified that he shipped in the vessel at Liverpool, in December, 1864, on the voyage to Havana, and continued one of her crew while she was engaged in running the blockade, and down till her seizure by the crew, the 13th June, 1865. He stated that she was British built, called The Wren, and never had any other name; and that he knew nothing as it respected any bill of sale. Other witnesses examined on this subject of a sale agreed with this witness. Shipments addressed to him as master, dated Havana, 15th March, 1865, showed that Rais

beck, the registered master of the vessel, came out with her to Havana. Stiles was appointed master afterwards.

On the other hand, the material evidence, to prove that the vessel at the time of seizure was enemies' property, was as follows: The answers of the purser of the ship, McGahan, to the fourteenth interrogatory were thus:

"He *believes* that Frazer, Trenholm & Co., of Liverpool, are the owners of the vessel, and were so at the time she was seized; has no personal knowledge as to who are the owners; he has *heard* Major *Helms*, at Havana, and Mr. Lafitte also, at Havana, *speak of Frazer, Trenholm & Co., as owners.*"

So Duggan, one of the crew, in reply to the fifth interrogatory:

"He does not know to whom the vessel belonged, but *has heard* Captain Moore, one of her former masters, with whom he sailed in said vessel in former voyages, *say* that she was owned by the Confederate government."

Another item of proof relied on was, that Major Helms, a Confederate agent at Havana (and who had been connected in some way with the voyages of the vessel while running the blockade), appointed Stiles to the command of the vessel for the voyage from Havana to Liverpool. McGahan, the purser already mentioned, testified that the master was appointed to command, *as he understood*, by Major Helms, at Havana; he did not *know* who delivered possession of the vessel; he *believed* that the master took possession by the authority of Major Helms. Duggan, one of the crew, stated that the name of the master was Stiles; that he was appointed to the command of the vessel by Major Helms, at Havana.

McGahan was again examined, among others, on an order for further proofs, in which examination he says that he did not know who appointed Stiles to the command of the Wren at the time of leaving Havana; he *believed that Major Helms* appointed him; he arrived at the conclusion from hearing Major Helms speak of the resignation of the former captain.

It appeared, however, from the testimony of Stiles him-

self, and of Long, his first officer, that he was appointed to the command by a Mr. Ramsey, who shipped the crew at Havana for the voyage to Liverpool, and thus seemed to have had some agency of the vessel.

The first officer stated, also, that when he needed anything for the use of the vessel, he was generally sent by Captain Stiles to Ramsey to obtain it.

*Mr. Pierrepont, for the appellant*, contended—

*On the 1st point:* That the vessel having run the blockade and *completed* her return voyage, ceased to be *in delicto*.*

*On the 2d point:* That there was no sufficient evidence whatever—it being, at best, but slight and loose hearsay—of enemy property, even if war had not ceased before the capture, and made prize of war impossible. But the war had ceased. This capture was on June 16th. It was matter of public history, and one of which the court would take judicial notice, that Lee had surrendered 9th April, Kirby Smith and Johnson in the same month, and that Davis was captured on the 13th May. Independently of this, that the capture was by a band of mutineers while the vessel was on a peaceful voyage, which took from the case every aspect of capture *jure belli*.

*Mr. Ashton, special counsel of the United States, contra*, argued—

1. That the *last* voyage before the capture having been one in breach of blockade, this subjected the vessel to lawful capture on the present voyage.†

. 2. That the register was a mere cloak for rebel title, that the Lairds were not *novi hospites* in this court. They were notorious as builders of the Alabama and other piratical

---

* Wheaton on Captures, 306; Haslett *v.* Roche, Maritime Warfare, 175; 1 Duer on Insurance, 88; 1 Kent's Commentaries, 152; The Mentor, 1 Robinson, 179; The Rosalie and Betty, 2 Id. 343; The Nancy, 3 Id. 122; The Lisette, 6 Id. 387; Carrington *v.* The Merchants' Insurance Co., 8 Peters, 495; Williams *v.* Smith, 2 Caines, 1.

† The Christiansberg, 6 Robinson, 376.

cruisers of the rebel combination. Mr. Trenholm, of the firm of Frazer, Trenholm & Co., was a citizen of the rebel confederacy. The character of all these parties, and of rebel ship-building interests, was established by the judicial records of Great Britain and the diplomatic history of the late contest,* and were facts of which this court would take cognizance, and to which it would give due effect in a case of asserted ownership by these firms or any of their members, of a vessel found in any way employed or navigated in the interest of their rebel patrons. Moreover, Helm was an agent of the confederacy. Stiles had been an officer of its marine forces. And the spoliation of papers was the crowning proof. The capture was made *nondum cessante bello*, and though effected by non-commissioned persons, yet being adopted by the government, the property became on condemnation one of its droits, as it became, independently of capture, as part of the assets of the extinct confederation.

Mr. Justice NELSON delivered the opinion of the court.

The court below condemned the vessel on the ground that she was the property of the enemies of the United States. And this is the only question in the case. For, although it was insisted on the argument that the condemnation might have been placed on the ground that the vessel was taken in contemplation of law *in delicto*, for violating the blockade of the port of Galveston, Texas, the position is founded in a clear misapprehension of the law. The doctrine on this subject is accurately stated by Chancellor Kent.† "If a ship," he observes, "has contracted guilt by a breach of blockade, the offence is not discharged until the end of the voyage. The penalty never travels on with the vessel further than to the end of the return voyage; and, if she is taken in any part of that voyage, she is taken *in delicto*. This is deemed reasonable, because no other opportunity is afforded to the belligerent force to vindicate the law." And

* Diplomatic Correspondence, part 1, pp. 222, 377, 381, 382.
† 1 Commentaries, 151.

the modern doctrine is now well settled, that the only pen-alty annexed to the breach of a blockade is the forfeiture of vessel and cargo when taken *in delicto*.   The earlier doctrine was much more severe, and inflicted imprisonment and other personal punishment on the master and crew.

2. As respects the ownership.   The certificate of registry, under the English acts, must specify the name, occupation, and residence of the owner, the name of the ship, the place to which she belongs, her tonnage, the name of the master, the time and place of the built, name of the surveying offi-cer, together with a particular description of the vessel. This act has been fully complied with in the present case. And the certificate shows that the claimant is the builder of the vessel and owner, and the proofs show with reasonable certainty that his registered master brought the vessel to Havana, and was there engaged in command of her within three months after she was launched and fully equipped for the voyage, and which was within three months of the time when she was seized, as prize, by her crew.  It is quite appar-ent, therefore, upon the proofs, that the claimant not only built the vessel, but put his master in command in this, her first voyage, and the presumption would seem very strong, if not irresistible (nothing else in the case), that he continued the owner for the short period of six months, which elapsed after she was built, and before the seizure took place.   In addi-tion to this, she was in the command of a master claiming to represent Laird as owner.   These acts, in connection with the registry, afford strong evidence that the title of the vessel was in the claimant.*

Now, most of the proofs relied on to disprove this evidence are wholly inadmissible, and incompetent as testimony in a court of justice.   We cannot think that it needs any ar-gument to show that they do not rise to the character or dignity of testimony in any court that respects the law of evidence.

We agree that in the facts and circumstances surrounding

---

* Cowen's Phillips, vol. 3, p. 39; 3 Kent's Commentaries, 150.

and attending the history and operations of this vessel, and of the individuals connected with her, there are matters for well-grounded suspicion and conjecture as it respects the purpose and intent with which the vessel was originally built and sent to Havana; and, as she entered immediately in furnishing supplies to the enemy and receiving cargoes of cotton in return, it is not unnatural or unreasonable to suspect that the so-called Confederate States, or their agents, had some connection, if not interest in her. But this alone is not evidence upon which to found a judgment in the administration of justice. The facts that the master, Stiles, who was put in command of her for the voyage home, from Havana to Liverpool, was an officer in the enemies' naval service, and had belonged to the United States navy; and Helms, who was in some way, not explained, connected with her voyages in running the blockade, and who was the agent of the enemy at Havana, might well be entitled to consideration and weight on the question if there had been any legal proof in the case laying a foundation for such a conclusion. So, also, would the evidence that Stiles destroyed at the time of the capture a letter from Helms, agent of the ship, as he calls him, to himself, and an order for the payment to him for £40 on the delivery of the ship at Liverpool. But in the view we have taken of the case there is no foundation of legal proof of the ownership of the vessel in the Confederate States on which these circumstances can rest, or be attached, as auxiliary considerations to influence the judgment of a court.

Our conclusion is, that the decree below must be REVERSED, and the vessel

RESTORED, BUT WITHOUT COSTS.