## Jackson and Wife *v.* Crapp.

PARTNERSHIP.—*Shares of Partners in Capital Stock.*—Two persons entered into partnership for manufacturing purposes, contributing to the capital stock in certain unequal amounts. The partner who contributed the smaller amount was to take charge of the business and devote to it his personal labor; the other was not to give his personal attention to the business. At stated periods an account was to be taken, and the profits and losses were then to be shared equally, the agreement being silent as to the relative interests of the partners in the capital stock, and no definite time being fixed for the continuance of the partnership. The business resulted in loss.

*Held,* in a suit by one of the partners against the other, that they were entitled to share in the capital stock, not equally, but in proportion to the amounts contributed by them respectively thereto.

APPEAL from the Tippecanoe Circuit Court.

This was a suit by the appellee against the appellant Alvernus Jackson, on articles of partnership, Frances E. Jackson, wife of Alvernus, being made a party for the purpose of divesting her title to certain real estate alleged to have been purchased with partnership funds.

The issues having been formed, the court, by agreement of the parties, referred the cause to a special master in chancery, who reported, in substance, that on the 13th of November, 1865, Crapp, Wortman, and Jackson entered into a copartnership in the house-carpentering, shingle-mill, and box-making business and any other business they might agree upon, in accordance with a written agreement, made a part of the complaint and given in evidence; that Wortman and Crapp were each to pay into the concern one thousand dollars, and Jackson was to pay five thousand dollars; that Wortman and Crapp were to devote their entire time to labor for the firm, to balance the extra capital furnished by Jackson; that they were to share equally in the profits and losses of the business; that Jackson was to do nothing by way of labor or in the management of the business, which was to be managed by the other two partners; that a division of profits and losses was to be made every six months, but that no such division was ever made; that they each paid into the firm the money and performed the labor according to the contract; that they continued in the business as originally commenced until the 10th of February, 1866, when the firm purchased an interest of one Jones in a certain patent right to a wheat separater and silent feeder for about five thousand five hundred dollars, paying two hundred and fifty dollars down and giving notes for the remainder; that thereupon, in addition to their former business, they commenced to make machines under their patent, and continued to do so for some time, until they had expended large sums of money, when they discovered that their machines were worthless, and until they had become indebted about three thousand dollars, exclu-

sive of the Jones debt; that about the 1st of May, 1866, Wortman became desirous of withdrawing from the firm; that thereupon, by agreement with Crapp and Jackson, he withdrew, Crapp and Jackson paying some small debts and releasing whatever sums he had withdrawn from the firm, except that he was to retain a one-third interest in the patent right and be liable on the Jones debt for his one-third share; that, after the withdrawal of Wortman, Crapp and Jackson became the equal owners of Wortman's interest and were to share equally the profits and losses of the business; " but as to whether or not they were to be the equal owners of the property of the firm, the undersigned understands that he is not to decide;" that on the 5th of May, 1866, Crapp and Jackson made a pretended sale of most of the property of the firm to one Burt, consisting of one old and one new shop, the machinery and tools therein, lots eighty and eighty-one in Orth's addition to Lafayette, two horses, one spring wagon, and harness; that there was other property, to wit, stock on hand, one old wagon, and some accounts; that after the sale to Burt, who was Jackson's nephew, Jackson sold the new shop and machinery to one Kipp, receiving therefor two lots in Stockton's addition to Lafayette, on which there were incumbrances, and one lot in Beaumont's addition to Lafayette, receiving a deed therefor in the name of Frances E. Jackson, his wife; fifteen hundred dollars; and a note on one Coons for about fourteen hundred dollars, which he sold for twelve hundred dollars; that Jackson took the two horses himself, sold the wagon to one Blair for sixty dollars, and sold the two lots in Orth's addition, subject to a mortgage for twelve hundred dollars, to one Behm for six hundred dollars, and collected one hundred and twenty-eight dollars and seventy cents on account. " The total amount for which I find that Jackson should be charged, on account of property sold and retained and cash collected, is five thousand nine hundred and thirty-one dollars. He should be credited for moneys

paid on debts of the firm, exclusive of the Jones debt, three thousand and twenty-one dollars. Balance in his hands, two thousand nine hundred and sixteen dollars. It further appears that Crapp has paid out twenty-six dollars more than he has collected, which add to Jackson's account, to make them even, two thousand nine hundred and forty-two dollars. If, therefore, Jackson is entitled to first draw from the firm four thousand dollars he would be entitled to one half of $4,000—$2,942=$529, from Crapp; but if Crapp is entitled to one half of the entire stock, then he is indebted to Crapp in the sum of one thousand four hundred and seventy-one dollars. This, however, is liable to a modification on account of the Jones note. It appears that Wortman, Crapp, and Jackson were sued in the U. S. Court for five thousand two hundred dollars; that Jackson procured a compromise of the case by deeding back to Jones the patent and paying five hundred dollars; that he also paid Behm six hundred dollars for legal services—in all eleven hundred dollars; that Jackson released Wortman from liability for some amount less than one-third of the entire cost; that Behm was acting as the attorney of Jackson, or, at any rate, it is denied by Crapp that he ever personally employed Behm or consented to his employment; that Crapp refused to pay anything to compromise the claim, he claiming that they could successfully defend the case; that Behm told Crapp that Jackson did not want him to pay anything; but it does not appear that Jackson authorized Behm to make such a statement. It is also objected by Crapp that this matter cannot be determined in this suit, as it relates to a matter in which another party is involved. Should it, however, be held that this can be settled in this suit, then the two amounts before found would be modified, so as to make the amount due Jackson, in one case, eight hundred and ninety-five dollars and sixty-six cents, and the amount due Crapp, in the other case, one thousand one hundred and four dollars and thirty-four

cents. I further find, at plaintiff's request, that the labor of Wortman during the time he labored was worth three hundred and seventy-five dollars; and that the labor of Crapp during the time he labored was worth four hundred and fifty dollars."

The additional facts are sufficiently stated in the opinion.

FRAZER, C. J.—This was a suit by one partner against another. Issues were so formed that the principal inquiry involved was, what were the respective shares of the parties in the capital stock of the copartnership, one having put in five thousand five hundred dollars, the other fifteen hundred dollars, and the business having resulted in loss. Matters of account were also in issue.

The transcript informs us, that, "by agreement of parties, the court refers this cause and all matters in issue under the pleadings herein to Henry F. Blogett, whom the court appoints a special master in chancery in this behalf, and does order him to inquire into all matters of account between said parties as embraced in the pleadings, and report to this court his finding of the facts," &c.

The master reported the evidence taken before him, and also the state of the accounts, and that if the parties were equal owners of the capital stock then there was due from the defendant to the plaintiff one thousand one hundred and four dollars and thirty-four cents; but if their shares of capital were according to the amount invested by each, then the plaintiff was indebted to the defendant Alvernus Jackson eight hundred and ninety-five dollars and sixty-six cents. The master did not report the respective shares of the parties in the property or capital of the firm, saying that he understood that question was not to be decided by him. Nor did the court make any finding upon it, but having overruled a motion by Jackson for judgment in his favor for eight hundred and ninety-five dollars and sixty-six cents, rendered a judgment on the report against him in Crapp's

Jackson and Wife *v.* Crapp.

favor for one thousand one hundred and four dollars and thirty-four cents, Jackson objecting.

It is a general rule, that there must be a finding, general or special, covering the issues, before a judgment can be rendered.   Here the parties seem to have withheld the most important fact in controversy from the action of the referee, and hence his report was silent concerning it, saying, however, that if that fact were found for the plaintiff, he would be entitled to judgment, but if for the defendant, then he should have judgment, as already stated.   It is the inclination of a majority of the court that the report should have been set aside as insufficient, if a motion had been submitted to that effect.

The referee did find that the parties, Crapp and Jackson, and one Wortman, entered into a partnership in mechanical business in accordance with a written agreement, dated November 13th, 1865, which he reports, and by which it appears that Wortman and Crapp were to put in as capital two thousand dollars (one thousand dollars each), and Jackson five thousand dollars; that Wortman and Crapp were to take charge of the business and labor in person, Jackson to have no charge of the business; that the books were to be balanced at the end of every six months, and a dividend of one-third of the profits or losses to be made to each partner.   He further reported that each paid in the sum agreed upon, and in other respects performed his contract until May 1st, 1866, when Crapp and Jackson bought out Wortman, thus becoming equal owners of his interest, and were to share equally the profits and losses.   On the 5th of May, 1866, the shops, machinery, and tools were transferred to a third party.   Now, it may be determined from these facts what were the respective shares of Crapp and Jackson in the property of the firm.

The question as to the ownership of the property seems to depend entirely, then, upon the construction to be placed upon the written contract.

It must not be forgotten that the purpose of construction

of a contract is to ascertain what was really meant by the contracting parties.

In this case, the instrument does not speak expressly upon the matter in question; it does not say in terms what shall be the respective shares of the partners in the capital originally paid in. Is there, then, anything in it from which this may be ascertained by just inferences. It seems to us that there are some things which are very necessary to be considered. The capital furnished by Jackson was five times as great as that paid in by either of his copartners, and it was a considerable sum. The partnership was not to continue during any definite period, and consequently Crapp and Wortman could dissolve it at pleasure without incurring any responsibility for a violation of the contract; and if they had chosen to do so within a few weeks of its formation and before losses had occurred, they might, if the position of the appellee is correct, have each withdrawn with more than double the amount which he had invested, whilst Jackson would have found himself with less than half the sum which he had put in. So, too, if one of the copartners had died immediately after the formation of the firm. Did the parties intend to make such a contract as that? They have not done so expressly; must an absurdity so glaring be implied? The question ought not to demand discussion. When the terms of the contract will admit of several interpretations, that which is reasonable and which leads to just results shall be preferred to that which it may not be supposed a man in his right mind would have made, and which would open the way to injustice and wrong. There is surely nothing in the nature of a copartnership rendering it necessary or proper for the courts, in construing the written contract by which it is created, to disregard those sensible and just rules by which they are guided in interpreting any other written contract. Nor has our attention been called to any case in conflict with the view above indicated. It is very true, that where a partnership merely, is proved to exist, and there is nothing to show

Jackson and Wife *v.* Crapp.

what are the shares of the respective parties, it will be presumed that they are equal. This is the effect of what is said in Lindley, Collyer, Story, and Parsons, cited by the appellee; and it is the extent to which the cases go which are cited by those writers. Thus Story (Part., § 24), who has examined the subject very fully, states the rule: "In the absence of all precise stipulations between the partners, and in the absence of all other controlling evidence and circumstances, the rule of the common law is, that they are to share equally." And in the note he holds that the presumption of equality is not irresistible, but that where there are circumstances from which it must be fairly presumed that the partners intended to share in unequal proportions, the legal presumption of equality ought to yield to the presumption of fact.

As both parties accepted the report, and submitted it to the court below to ascertain from the contract and facts reported what the rights of the parties were, each claiming judgment upon it, and the cause is presented here in the same way, our direction to the court below will be to enter judgment in Jackson's favor for eight hundred and ninety-five dollars and sixty-six cents.

Reversed, with costs; cause remanded, with directions as above.

GREGORY, J., thinks that the judgment in favor of Jackson ought to be five hundred and twenty-nine dollars.

*J. M. LaRue, G. O. Behm,* and *A. O. Behm,* for appellants.

*M. Jones, J. L. Miller, S. T. Stallard, W. C. Wilson,* and *S. E. Perkins,* for appellee.