MAYER v. GARVAN, Alien Property Custodian, et al.

(District Court, D. Massachusetts. December 10, 1920.)

No. 925.

1. **Absentees ⬅5—Contract for dissolution of German partnership by absence trustee invalid.**

Under German Civ. Code, §§ 1822, 1911, 1915, providing for appointment of a curator or absence trustee for a person who is absent and whose residence is unknown, or who is prevented from returning to care for his property affairs, that such curator shall be subject to the provisions relating to guardianship, and that a guardian requires ratification by the guardianship court of a contract for alienation of the ward's property or business, such a curator for an absent member of a German partnership, in the absence of specific authority from the guardianship court, *held* without power to contract for the dissolution of the partnership and the disposition of the partner's interest, and without power, even with such authorization, where such partner was a citizen or subject of a foreign country.

2. **Partnership ⬅262—Ratification of dissolution contract cannot affect intervening rights.**

Ratification by an American partner in a German partnership of a contract made without his authority or knowledge for a dissolution of the partnership and a transfer to him of its property in the United States, to take effect on commencement of war between the United States and Germany, *held* not to relate back under German or American law, so as to affect rights acquired by the Alien Property Custodian by a seizure of such property prior to the ratification.

3. **Partnership ⬅263—Enemy partnership having American business dissolved by war.**

A German partnership, providing for a branch of the business in the United States to be conducted by an American partner, *held*, under the law of the United States, dissolved by the declaration of war between the United States and Germany, so far as related to the American partner and the business conducted in the United States, although under the German law the war did not effect a dissolution.

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**4. War ☞12—Alien Property Custodian not entitled to possession of property of enemy partnership having American partner.**

A German partnership had a branch of its business in the United States, in charge of an American partner; other partners being German subjects. *Held,* that the partnership, as related to the American partner and business, was dissolved by the declaration of war, but that the American partner had an equitable lien on the assets in the United States for the purpose of having them applied to payment of the firm debts and the liquidation of his interest in the partnership, and that under Trading with the Enemy Act, § 8 (a), being Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½dd, he was entitled to retain possession of the property and liquidate the business, being responsible to the Alien Property Custodian only for any surplus remaining which would be the property of the enemy partners.

In equity. Suit by Richard Mayer against Francis P. Garvan, Alien Property Custodian, and others. Decree for complainant.

Guy Murchie, G. W. Cox, Butler, Cox, Murchie & Bacon, and Edward F. McClennen, all of Boston, Mass., for plaintiff.

The United States Attorney, and Elias Field, Sp. Asst. Atty. Gen., both of Boston, Mass., for Alien Property Custodian.

B. Devereux Barker and Harold Williams, Jr., both of Boston, Mass., for defendants Richard Mayer Co. and Anglo-American Cotton Co.

BINGHAM, Circuit Judge. This is a bill in equity under section 9 of the Trading with the Enemy Act (40 Stat. at Large, c. 106, p. 411 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½e]), brought against the Alien Property Custodian and the Treasurer of the United States. The Richard Mayer Company and the Anglo-American Cotton Company, Massachusetts corporations, Edwin Reis of Heidelburg, Germany, the estate of Ludwig Reis, late of Mannheim, Germany, and Karl B. Strauss, a naturalized Englishman, but now residing in Germany, are also named as defendants. The plaintiff, Richard Mayer, was born in Germany. He came to the United States in 1898 and since then has resided here. In 1912 he was naturalized as a citizen of the United States. In 1913, while in Germany, he entered into a partnership with Edwin Reis, Ludwig Reis, and Karl B. Strauss. Mrs. William Reis, of Heidelburg, was a special partner.

The partnership had its chief place of business in Germany, but it also had established houses in England and the United States. The partnership agreement provided that the German commercial and civil court laws should determine the rights of the partners and that the German court at Mannheim should be resorted to for the settlement of differences. Mayer contributed to the partnership the business that he had previously conducted in Boston, valued at about $50,000, or 200,000 marks; Edwin Reis and Ludwig Reis contributed property valued at 1,179,845.03 marks and at 1,136,867 marks, respectively; and Karl B. Strauss at 348,313 marks. The partners were to have 4½ per cent. on their capital, and the profits were to be divided 27½ per cent. to each of the Reises, 25 per cent. to Strauss, and 20 per cent. to Mayer. Edwin and Ludwig Reis were to have a salary of 22,-

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

000 marks each, Strauss 20,000 marks, and Mayer 16,000 marks; and the share of each in the profits of the business was to go to increase his capital in the concern. The partnership was to begin July 1, 1913, and continue until November 30, 1915, and thereafter for periods of two years, unless written notice of termination should be given six months before the expiration of any given period. No notice of termination was ever given.

Mayer managed the partnership business in this country, Strauss that in England, and the Reises the business in Germany. Strauss was in Germany when the war broke out, and has since remained there. The British government seized the property and business in London.

In 1914 the Boston business was incorporated under the name of the Richard Mayer Company. Later the Anglo-American Cotton Company was incorporated. The capital of these companies was paid in from the assets of Reis & Co. in Mayer's hands. The capital stock of the Richard Mayer Company consisted of 2,000 shares, of the par value of $100 each, and by June 8, 1915, 1,995 of these shares had been transferred to Mayer's name. The remaining 5 shares stood in the names of different persons, apparently as nominal holders to quailify them as officers.

The Anglo-American Cotton Company was incorporated July 1, 1915. It had a capital stock of 500 shares, of a par value of $100, of which 498 shares were issued to J. Laible, an employé and manager of the company.

In 1914 and 1915 Reis & Co. remitted money to the Boston house for the purchase of goods for export. The last of these remittances was early in 1915, and the last shipment of goods purchased therewith was in March, 1915.

Mrs. William Reis, the special partner, having died, the heirs of her estate, in 1916, called upon the firm for a declaration that she was no longer a member of the firm. This declaration had to be signed by all the partners, including Mayer. As Mayer could not be reached, the German court required the appointment of an absence trustee, and, purporting to act under the provisions of paragraph 1911 of the German Civil Code, it appointed Karl Mayer, brother of Richard, absence trustee for Richard.

February 7, 1917, Edwin Reis, Ludwig Reis, Karl B. Strauss, and Karl Mayer, as absence trustee for Richard Mayer, entered into an agreement for the dissolution of the partnership of Reis & Co., to take effect on the outbreak of war between the United States and Germany. A copy of the contract is annexed to the bill of complaint as Exhibit B. Under this agreement the European partners were to have all the assets of the firm in Europe, and Richard Mayer all the assets in the United States. Mayer, "in case of war," separated himself from the firm, and renounced all claim that he had against the European assets in favor of the European partners; and the European partners did likewise, and renounced their claims against the assets in the United States. When the war broke out between the United States and Germany, the European partners took over all the European assets and treated them as their own, and themselves as the only partners

remaining in Reis & Co. The German government was requiring liquidation of partnerships where the enemy interest exceeded 30 per cent. The interest of Strauss, the British partner, was 25 per cent., and of Mayer 20 per cent., making the total enemy interest 45 per cent. It was to avoid liquidation of the firm by the German government in case of war with the United States that the dissolution arrangement was entered into.

The plaintiff had no knowledge of the appointment of his brother as absence trustee, or of the agreement of February 7, 1917, until the spring of 1919, when, on April 7, 1919, he ratified it by bringing this suit, of which the European partners had notice by registered mail. There is no evidence that the German court specifically authorized the absence trustee to enter into the dissolution agreement, or that it ratified his act.

At the date of the dissolution agreement, February 7, 1917, the American assets, according to the last report known to the German partners—that of November, 1915—were not far from 20 per cent. of the total American and European assets. The books in America were kept in dollars; those in Germany, in marks. The partnership agreement would indicate that the ratio of marks to dollars, used in computing the capital of the firm, was about 4. It is claimed that the agreed ratio of conversion in accounts between the partners was 4.20 marks to the dollar, but I do not think the evidence warrants me in finding that this is so.

May 18, 1918, after investigation and determination as provided in the Trading with the Enemy Act, the Custodian caused the property and capital stock of the Richard Mayer Company and the Anglo-American Cotton Company to be transferred to him, and on September 20, 1918, after like investigation and determination, he took possession of securities held by the plaintiff, but purchased with partnership funds. The property seized was the following:

| | |
|---|---:|
| 2,000 shares, Richard Mayer Co. | |
| 500 shares Anglo-American Cotton Co., Cash | $ 2,155.61 |
| Securities taken from Lee, Higginson Co., held on Richard Mayer's account, costing | 114,491.52 |
| Securities taken from Mayer's safe deposit box No. 3722, in the First National Bank of Boston, costing | 236,900.26 |
| Sundry small notes taken from safe of Richard Mayer Co., costing | 1,725.00 |

All of the property so seized was purchased with partnership assets. The actual value of the American assets has not been proved. The book value of Mayer's interest in the German assets, as of April 6, 1917, according to the report of Price, Waterhouse & Co., leaving out the English and American assets, was 2,149,792.90 marks. The ratio of marks to the dollar on April 6, 1917, has not been proved, and nothing has been shown indicating whether the English business was an asset or a liability. Furthermore, it cannot be determined whether the German assets, as reported by Price, Waterhouse & Co., are accurate, as they state that they were denied access to certain "vital books of account."

In November, 1918, and March, 1919, the plaintiff gave due notice of his claim to the Alien Property Custodian as per Exhibit E attached to the bill of complaint.

According to section 6 and section 7 (c) of the act (sections 3115½cc, 3115½d), the money and property which is to go to the Alien Property Custodian, or he is given the right to take, is:

"Any money or other property * * * owing or belonging to or held for * * * an enemy or ally of enemy * * * which the President after investigation shall determine is so owing or so belongs or is so held."

By section 8 (a), being section 3115½dd, U. S. Comp. St., it is provided:

"That any person not an enemy or ally of enemy holding a lawful * * * lien, or other right in the nature of security in property of an enemy or ally of enemy which, by law or by the terms of the instrument creating such * * * lien, or right, may be disposed of on notice or presentation or demand, * * * may continue to hold said property, and, after default, may dispose of the property in accordance with law * * * and under such rules and regulations as the President shall prescribe: * * * Provided, that no such rule or regulation shall require that notice or presentation or demand shall be served or made in any case in which, by law or by the terms of said instrument or contract, no notice, presentation or demand was, prior to the passage of this Act, required: * * * Provided further, that if, on any such disposition of the property, a surplus shall remain after the satisfaction of the * * * lien, or other right in the nature of security, notice of that fact shall be given to the President pursuant to such rules and regulations as he may prescribe, and such surplus shall be held subject to his further order."

November 4, 1918, Congress amended section 7 (c) of the Trading with the Enemy Act of October 6, 1917, and added the following clause:

"The sole relief and remedy of any person having any claim to any money or other property heretofore or hereafter conveyed, transferred, assigned, delivered, or paid over to the Alien Property Custodian, or required so to be, or seized by him shall be that provided by the terms of this act, and in the event of sale or other disposition of such property by the Alien Property Custodian, shall be limited to and enforced against the net proceeds received therefrom and held by the Alien Property Custodian or by the Treasurer of the United States."

The remedy provided by the act is found in section 9, as amended July 11, 1919, which reads as follows:

"That any person not an enemy or ally of enemy claiming any interest, right, or title in any money or other property which may have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian hereunder and held by him or by the Treasurer of the United States, or to whom any debt may be owing from an enemy or ally of enemy whose property or any part thereof shall have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian hereunder, and held by him or by the Treasurer of the United States, may file with the said Custodian a notice of his claim under oath and in such form and containing such particulars as the said custodian shall require; and the President, if application is made therefor by the claimant, may order the payment, conveyance, transfer, assignment, or delivery to said claimant of the money or other property so held by the Alien Property Custodian or by the Treasurer of the United States or of the interest therein to which the President shall determine said claimant is entitled. * * * If the President shall not so

order within sixty days after the filing of such application or if the claimant shall have filed the notice as above required and shall have made no application to the President, said claimant may, at any time before the expiration of six months after the end of the war institute a suit in equity * * * in the District Court of the United States for the district in which such claimant resides * * * (to which suit the Alien Property Custodian or the Treasurer of the United States, as the case may be shall . be made a party defendant), to establish the interest, right, title, or debt so claimed, and if suit shall be so instituted then the money or other property of the enemy; or ally of enemy, against whom such interest, right, or title is asserted, or debt claimed, shall be retained in the custody of the Alien Property Custodian, or in the Treasury of the United States, as provided in this act, and until any final judgment or decree which shall be entered in favor of the claimant shall be fully satisfied by payment or conveyance, transfer, assignment, or delivery by the defendant or by the Alien Property Custodian or Treasurer of the United States on order of the court, or until final judgment or decree shall be entered against the claimant, or suit otherwise terminated: * * *

"Except as herein provided, the money or other property conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian shall not be liable to lien, attachment, garnishment, trustee process, or execution, or subject to any order or decree of any court." 41 Stat. 35.

An "enemy," so far as applicable to this case, is defined in section 2 (a) to be:

"(a) Any individual, partnership, or other body of individuals, of any nationality, resident within the territory (including that occupied by the military and naval forces) of any nation with which the United States is at war, or residual outside the United States and doing business within such territory. * * *" Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½aa.

[1] The plaintiff in his bill asks relief on different grounds. One is that he is entitled to have the American property that was seized and its proceeds restored to him, because it was his at the outbreak of the war, April 6, 1917, by virtue of the dissolution agreement of February 7, 1917.

A decision of this question involves a consideration of the power of the German guardianship court to grant authority to Karl Mayer to act as curator or absence trustee for the plaintiff, and, if it had such power, (1) whether he exercised that authority in accordance with the German law governing contracts disposing of interests in property; and (2) if the commission issued by the guardianship court did not confer upon him the required authority, or if it did, and he did not comply with the provisions of German law necessary to the creation of a valid contract, then whether the plaintiff, inasmuch as Karl Mayer undertook to act for the plaintiff and in his behalf, upon becoming aware of the transaction, could ratify it, and whether the ratification would relate back to the time of entering into the contract in disregard of intervening rights, if any.

In the German Civil Code (Wang's translation) it is provided:

"1911. A curator absentis may be appointed for a person of full age, who is absent and whose place of residence is unknown, to take charge of his property affairs so far as is necessary. * * *

"The same rule applies to an absent person whose place of residence is known, but who is prevented from returning to take charge of his property affairs."

"1915. Unless it is otherwise provided by law, the provisions applicable to guardianship apply mutatus mutandis to curatorship."

"1821. A guardian requires the ratification of the guardianship court:

"(1) For disposing of land or of any right over land;

"(2) For disposing of a claim which has for its object the transfer or ownership of land, or the creation or transfer of a right over land, or the discharge of a piece of land from such right;

"(3) For incurring an obligation to do any one of the acts of disposition specified in (1) and (2). \* \* \*

"1822. A guardian requires the ratification of the guardianship court:

"(1) For any juristic act whereby the ward is bound to dispose of his property as a whole; \* \* \*

"(3) For any contract which has for its object the acquisition or alienation of a business for a valuable consideration, and for a contract of partnership entered into for the purpose of carrying on a business. \* \* \*

"1823. Without the ratification of the guardianship court the guardian should not start any new business in the name of the ward, nor discontinue an existing business of the ward."

It is conceded that the plaintiff was an American citizen residing at Boston and that his residence was known, and, if it be assumed that he was prevented from returning to Germany in 1916, due to war conditions, and that the guardianship court had authority to appoint a curator absentis for an adult person not a resident of Germany, I find that the curator or absence trustee, in the absence of specific authorization or subsequent ratification from the guardianship court (of which there is no evidence in this case), could not legally enter into a contract dissolving the partnership and disposing of the plaintiff's interest in the partnership property, even though the contract was duly authenticated. Furthermore, as the plaintiff was a subject of a foreign state, and not a citizen of Germany, I find that the guardianship court was without authority to appoint an absence trustee for him under the provisions of law above set forth.

In the imperial statute introducing the Civil Code, provision is made for the appointment of a curator for a subject of a foreign state, but none of the circumstances authorizing such appointment are to be found in this case. See The Principles of German Civil Law (E. J. Schuster) p. 560.

Then, again, I find that, if the absence trustee was authorized by the guardianship court to enter into a contract for the dissolution of the partnership and a transfer of the plaintiff's interest in the partnership property, it was not executed in accordance with German law and was invalid.

On this subject the German Civil Code contains the following provisions:

"311. A contract whereby one party binds himself to convey his present property or a fractional part of his present property or to charge it with a usufruct, requires judicial or notarial authentication."

"313. A contract whereby one party binds himself to transfer ownership of a piece of land requires judicial or notarial authentication. A contract concluded without observance of this form becomes valid in its entirety if conveyance by agreement and entry in the land register have taken place."

"128. If judicial or notarial authentication of a contract is prescribed by law, it is sufficient if first the offer and later the acceptance of the offer be authenticated by a court or notary."

"125. A juristic act which is not in the form prescribed by law is void. * * *"

The contract of February 7, 1917, required judicial or notarial authentication whether Karl Mayer, as absence trustee, had authority to enter into the contract or whether he was acting without authority and in behalf of the plaintiff.

If, however, it could be said that, although the contract related to the transfer of property or rights in property, both real and personal, it did not require, under German law, judicial or notarial authentication, the question, so far as it concerns German law, would be whether the ratification which the plaintiff made of the unauthorized act of his brother relates back to the time of the making of the contract, and avoids any rights or interest which the government acquired in the American assets that belonged to the German partners before ratification.

(2) The German Civil Code contains the following provision as to this matter:

"184. Subsequent consent [i. e., ratification] operates as from the moment when the juristic act was entered into, unless it is otherwise provided.

"Dispositions affecting the object of the juristic act which before the ratification have been made by the party ratifying, or which have been effected by means of compulsory execution or distraint or by a trustee in bankruptcy, are not invalidated by the retrospective operation of the ratification."

It is contended (1) that on the outbreak of war between the United States and Germany on April 6, 1917, the partnership agreement was terminated by the contract of February 7, 1917, and as a matter of law; and (2) that the above provision of law does not apply in this case, for the reason that it affects only the disposition of property made by the party ratifying, or by compulsory execution or distraint issued against such property; (3) that the government acquired no right or interest by its seizure in that part of the partnership property claimed to be transferred, under the contract, to the German partners, that was located in Germany, for it never seized that property; and (4) that the property seized was the American property, which the German partners transferred to the plaintiff, and that the provision of law above recited does not relate to that. I find, however, that, under the German law, as well as the American law, ratification will not be permitted to relate back, so as to cut off intervening rights acquired by strangers to the contract, either in the property agreed to be transferred by the other party to the party ratifying, or in the property agreed to be transferred by the party ratifying to the other party, and that whatever rights the government acquired by the seizure in the American assets that belonged, at the date of seizure, to the German partners, are not cut off by the ratification. This is the rule in England (Lyell v. Kenedy, 18 Q. B. D. 796), notwithstanding it is there held that the other party has no right to withdraw his offer made to an unauthorized agent before ratification by the principal, if ratification is made within a reasonable time. In re Portuguese Cons. Copper Mines, 45 Ch. D. 16; Bolton v. Lambert, 41 Ch. D. 295; Brown v. Street, 3 Dom. L. R. 291; In re Tiedemann [1899] 2 Q. B. 66; 2

C. J. p. 524; Wharton's Commentaries on Agency & Agents, §§ 77, 78. The American cases on the subject may be found in 2 C. J. 518.

Stoddart v. United States, 4 Ct. Cl. 511, was a case where, on the outbreak of the Civil War, the plaintiff, who had been engaged in business in one of the rebel states, came North, leaving behind him property which his agent sold, and subsequently, without authority, invested in cotton for the plaintiff's benefit. The cotton was confiscated by the government. After confiscation the plaintiff ratified the act of his unauthorized agent and brought suit against the government for the proceeds of the cotton. It was held that the plaintiff's ratification could not relate back, to the prejudice of the rights acquired by the government in the seizure of the cotton.

[3] In case the plaintiff cannot avail himself of the contract of February 7, 1917, for the purpose of establishing an absolute title in the American assets as against the German partners and the intervening rights of the government acquired by its seizure, he contends that he is entitled in this proceeding to have the possession of those assets restored to him; that, on the breaking out of war between the United States and Germany, the partnership was terminated, and that he had a lien on the assets with a right of possession to secure the payment of the firm debts, the payment of any sum due the firm from other members of the firm, and the payment of any sum due him as his interest in the firm on liquidation; that, inasmuch as he had such a lien, he was entitled, under section 8 (a) of the Trading with the Enemy Act, to continue to hold said property and to liquidate the same "in accordance with law and under such rules and regulations as the President might prescribe," and should a surplus remain after satisfaction of the lien that he should notify the President thereof and hold such surplus subject to his further order.

It is conceded to be the settled law of England and of this country that a declaration of war between nations dissolves a partnership, the members of which are subjects of belligerent nations. The William Bagaley, 5 Wall. 377, 407, 18 L. Ed. 583; Hanger v. Abbott, 6 Wall. 582, 18 L. Ed. 939; Anglo-Mexican, 118 L. T. (N. S.) 260; Hugh Stevenson & Co., Ltd., v. Aktiengesellschaft fur Cartonnagen Industrie, (1918) A. C. 239; Mutual Benefit Life Insurance Co. v. Hillyard, 37 N. J. Law, 444, 474, 18 Am. Rep. 741.; Griswold v. Waddington, 15 Johns. (N. Y.) 57; Id., 16 Johns. 438, 488. The defendants, however, contend that, inasmuch as the partnership agreement was executed in Germany, and the firm had a place of business there, and it was expressly provided that the German commercial and civil court laws should govern its relations, the partnership contract was a German contract, and that, under the German law, war in and of itself did not dissolve the partnership, even though the partners were subjects of enemy nations.

I find as a fact that according to German law a partnership of this character would not be dissolved by the outbreak of war. But it does not seem to me that this is a controlling circumstance. The parties, on entering into the contract of partnership which provided for the establishment of an American house, must have understood that if.

the continuation of the contract, so far as it related to the American partner and the business conducted here, was, in case of war, a violation of the laws of this country, it could not be enforced here as an operative agreement. But whatever they thought about it, and notwithstanding the partnership was not dissolved under the German law by the outbreak of war, it was under the law of the United States, for its laws do not sanction the continuation of business relations between its citizens and citizens of a nation with which it is at war. The Kensington, 183 U. S. 263, 269; 22 Sup. Ct. 102, 46 L. Ed. 190, and cases above cited.

[4] The partnership being dissolved by the outbreak of war, the question is: What were the rights of the plaintiff in the American assets then in his hands? It seems to be well recognized that on the dissolution of a partnership a partner is entitled as against the other partners and all persons claiming through them in respect to their interest as partners, to have the property of the partnership applied to the payment of the debts and liabilities of the firm, and have the surplus assets, after such payment, applied to the payment of what may be due to the partners. And this right constitutes what is known as a partner's lien. In Standish v. Babcock, 52 N. J. Eq. 628, 29 Atl. 327, Vice Chancellor Van Fleet, in discussing this question, said:

"The law regulating the rights of copartners inter sese is well settled. No partner has a right to take any part of the partnership property, either during the existence of the partnership or after it has been dissolved, and say that it is his exclusively. 1 Lindl. Part. (5th Ed. 1888) 339. Each partner has a lien on the partnership property for the payment of the partnership debts, and also on the surplus remaining after the liabilities are discharged, for his share thereof. Lord Justice Lindley decribes this lien or right substantially as follows: Each partner has an equitable lien on the partnership property for the purpose of having it applied in discharge of the debts of the firm; and he has a similar lien on the surplus assets for the purpose of having them applied in payment of what may be due to the partners, respectively, after deducting what may be due from them, as partners, to the firm. This lien does not exist for any practical purpose until the affairs of the partnership have to be wound up; but when the partnership accounts have been taken, and the shares of the partners have been ascertained, then the lien of the partners on the assets of the partnership, and on each other's shares, becomes of the greatest importance. 1 Lindl. Part. 352. Judge Story, both in his Commentaries on the Law of Partnership and on Equity Jurisprudence, gives a similar description of this right. Story, Partn. § 97; 2 Story, Eq. Jur. § 1243. And Mr. Collyer, in speaking of it, says: 'Each partner has a specific lien on the partnership stock, not only for the amount of his share, but for moneys advanced by him beyond that amount for the use of the partnership, as also for moneys abstracted by his copartner beyond the amount of his share.' Colly. Partn. (3d Am. Ed.) p. 109, § 125. This lien was recognized by Chancellor Kent in Nicoll v. Mumford, 4 Johns. Ch. 522, 525, by Chief Justice Shaw in Dyer v. Clark, 5 Metc. (Mass.) 562, 578, and by Mr. Justice Bradley in Hoyt v. Sprague, 103 U. S. 613, 624."

I therefore conclude that on the dissolution of the partnership by the outbreak of the war the plaintiff had a lien on the American assets and their proceeds for what was due him from the firm upon an accounting of the affairs of the partnership and was entitled to retain the American assets in his hands as security. Was his right therein

changed; and, if so, in what respect, by the enactment of the Trading with the Enemy Act of October 6, 1917, and the seizure by the Alien Property Custodian in 1918?

By section 6 of that act, as above pointed out, the thing which is to go to the Alien Property Custodian is something "belonging to an enemy." The firm of Reis & Co. was not an enemy at the time of the passage of the act or at the time of the seizure, for it had been previously dissolved. The enemy or enemies, within section 2 (a) and 6 of the act, were the former German partners, and it was their interest that the Alien Property Custodian was entitled to seize; but his right of seizure did not extend to dispossessing the plaintiff of the American assets, for section 8 (a) of the act entitled the plaintiff to continue to hold the property and to liquidate the same to satisfy his interests, and to pay over the surplus or what belonged to the enemy partners to the custodian. As the only right the Alien Property Custodian had in the American property was through the enemy partners, in whose right he stood, he was entitled to demand and receive from the plaintiff only what they were entitled to receive, which was not the property itself, but their interest in the surplus, if any, after an accounting. Bank v. Carrollton Railroad, 11 Wall. 624, 20 L. Ed. 82; Karrick v. Hannaman, 168 U. S. 328, 18 Sup. Ct. 135, 42 L. Ed. 484.

I therefore find that the plaintiff is entitled to be repossessed of all the property seized and the proceeds arising therefrom, and to hold the same subject to the provisions of section 8 (a).

If an accounting would be advisable at this time, so as finally to conclude the matter, I find that on the present state of the evidence I am unable to state an account. There is no evidence of the actual value of the American property, or of the German or English property. The liabilities of the firm, so far as the evidence disclosed, cannot be ascertained, and the value of the German mark on the date of the dissolution of the firm, or any subsequent date as of which an accounting should be stated, has not been presented. Furthermore, it is doubtful, according to the report of Price, Waterhouse & Co., what the German assets are, as they were denied access to certain vital books of account in making their investigation.

A decree may be drafted on the lines above indicated and submitted for the approval of the court.