**ROSSIE v. GARVAN, Alien Property Custodian, et al. (two cases).**

(District Court, D. Connecticut. June 3, 1921.)

Nos. 1512, 1513.

1. **Partnership ⇐⇒268—Between citizen of United States and alien enemy dissolved by war.**

   Under the settled law of the United States, which is based on public policy, a partnership between citizens of the United States and citizens or subjects of a foreign country is dissolved by a declaration of war between the two countries, regardless of the fact that it is a partnership of the foreign country, by whose laws war does not effect a dissolution.

2. **War ⇐⇒12—Citizen members of German partnership, dissolved by war, entitled to recover their share of American assets.**

   Where some of the members of a German partnership were German subjects, and others were citizens of the United States, where a branch of the business was conducted, the American members *held* entitled, under Trading with the Enemy Act Oct. 6, 1917, § 9 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½e), to recover their share of the property and assets of the firm in the possession of the Alien Property Custodian and the Treasurer of the United States.

3. **Partnership ⇐⇒305—Partners presumed entitled to share equally in assets on dissolution.**

   In the absence of any provision on the subject in a contract of partnership by which the partners were to share equally in the profits, the

presumption is that they are entitled to share equally in its property and assets on dissolution.

In Equity. Suits by John Rossie and by Ernst Rossie against Francis P. Garvan, Alien Property Custodian, and others. Decrees for complainants.

Frederick H. Wiggin, of New Haven, Conn., and Chauncey B. Garver, of New York City, for plaintiffs.

Allan K. Smith, Asst. U. S. Atty., of Hartford, Conn., and Dean H. Stanley, of Washington, D. C., Sp. Asst. Atty. Gen., for defendants Alien Property Custodian and Treasurer of the United States.

James E. Wheeler, of New Haven, Conn., for defendants Elizabeth Rossie and others.

THOMAS, District Judge. Separate bills in equity were filed in behalf of each plaintiff. By order of court they were consolidated, tried together, and will be decided together. The suits were brought pursuant to the provisions of section 9 of the Trading with the Enemy Act (40 Stat. at Large, c. 106, p. 411 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½e]), and are against the Alien Property Custodian, the Treasurer of the United States, and five other defendants. Section 9 provides, inter alia:

"That any person, not an enemy, or ally of enemy, claiming any interest, right, or title in any money or other property which may have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian hereunder, and held by him or by the Treasurer of the United States," may, after the performance of certain conditions precedent, all of which have been complied with in these cases, "at any time before the expiration of six months after the end of the war, institute a suit in equity in the District Court of the United States for the District in which such claimant resides, * * * to establish the interest, right, title, or debt so claimed."

The plaintiffs are naturalized American citizens living in Mystic, Conn., and have resided continuously in the United States for some years prior to and since naturalization. John Rossie obtained his final papers on June 4, 1912, and Ernst Rossie received his on October 5, 1915. They were members of a partnership which was formed by an agreement written in German, and signed by them at Mystic, Conn., on October 21, 1912; the partnership contract having been previously signed by the other partners, Carl Rossie, Marie Rossie, Kuni Rossie, and Alfred Rossie, in Germany, on October 7 and 8, 1912. The partnership agreement was also signed in Germany by C. Ad. Rossie, but he died before these suits were brought, and under the terms of the contract his widow, Elizabeth Rossie, succeeded to his interest, and so became a member of the partnership in his stead, and is also named as a party defendant, together with the other German partners, all of whom have been at all times German subjects residing in Germany.

It appears, from the terms of the partnership agreement and from other evidence, that each one of the seven members of the partnership agreement was entitled to receive one-seventh of the partnership profits. The partnership was the owner of 400 out of a total of 500

shares of the capital stock of the Rossie Velvet Company, a New Jersey corporation, engaged in the manufacture of velvets at Mystic and Willimantic, Conn. The product manufactured by this corporation was sold in the United States, and none of it was exported to Europe.

The partnership was engaged in the manufacture in Germany of velvets, but the American branch of the business was larger, and its gross sales exceeded those of the German Branch. The partnership also owned three parcels of land in Mystic, Conn., which were, at the time of the trial, of the aggregate value of $13,250. The firm owed no debts at the time of the declaration of war between the United States and Germany.

The parties are agreed, as appears from the pleadings and evidence, that between October 22, 1917, and November 1, 1918, there came into the custody of the Alien Property Custodian, after investigation and determination as prescribed in the Trading with the Enemy Act said 400 shares of the capital stock of the Rossie Velvet Company, said three pieces of real estate in Mystic, and various amounts of cash and Liberty Bonds. The 400 shares of stock of the Rossie Velvet Company were sold at auction by the Alien Property Custodian, so that at the time of trial the Treasurer of the United States held, credited to "Trust No. 2692—Gebruder Rossie," Liberty Bonds of the par value of $655,000, cash amounting to $721,419.89, and the real estate above mentioned, of the value of $13,250.

The prayers for relief in each bill seek to have the Alien Property Custodian and the Treasurer of the United States pay over and deliver to each plaintiff a one-seventh part of said property now held by the Treasurer of the United States, including the interest coupons attached to said Liberty Bonds, or the proceeds of any which may have been collected, and any interest which may have been received on the money collected.

It appeared in evidence, and I find as a fact, that under the German law, if a partnership is organized in Germany and has its principal place of business there, and some of the partners reside in Germany, while others reside in the United States, the partnership was not dissolved by the outbreak of war between Germany and the United States, and that a partnership of this character could, under German law, be dissolved before the date fixed in the agreement for its termination only by a petition to a German Court praying for such dissolution. It further appeared, and I find as a fact, that since the war German courts have, on petition of German citizens, in various instances dissolved such agreements. It also appeared that a partnership is not a legal entity under the German law.

By section 2 of the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½aa), the word "enemy" shall be deemed to mean:

"Any individual, partnership, or other body of individuals, of any nationality, resident within the territory (including that occupied by the military and naval forces) of any nation with which the United States is at war, or resident outside the United States and doing business within such territory," etc.

274 F.—29

The words "to trade" shall be deemed to mean:

Under (c): "Enter into, carry on, complete, or perform any contract, agreement or obligation."

Under section 3 (section 3115½b) it is held that it shall be unlawful "for any person in the United States," with certain exceptions, "to trade or attempt to trade" with an enemy or ally of an enemy.

Under section 3(c) it is provided:

"That it shall be unlawful for any person"—with certain exceptions—"to send, take, or transmit, or attempt to send, take, or transmit out of the United States, any letter or other writing, * * * or other form of communication intended for or to be delivered, directly or indirectly, to an enemy or ally of enemy."

Under section 8(a)—section 3115½dd—it is provided:

"That any person not an enemy or ally of enemy holding a lawful * * * lien or other right in the nature of security in property of an enemy or ally of enemy which * * * may be disposed of on notice or presentation or demand * * * may continue to hold said property, and, after default, may dispose of the property in accordance with law or may terminate or mature such contract by notice or presentation or demand served or made on the Alien Property Custodian, * * * and such notice and such presentation and demand shall have, in all respects, the same force and effect as if duly served or made upon the enemy or ally of enemy personally."

[1] By the settled law and policy of this country all executory contracts with enemies of the United States, including partnerships, are abrogated by the declaration of war between this country and such enemy. Story on Partnership, § 315; Lindley on Partnership (5th Ed.) 585; Rowley on Partnership, §§ 186, 577; The William Bagaley, 5 Wall. 377, 18 L. Ed. 583. In Griswold v. Waddington, 16 Johns. (N. Y.) 438, Chancellor Kent, in speaking of a partnership which had been entered into between British subjects and American citizens before the declaration of war between their respective nations, said, at page 488:

"It appears to me that the declaration of war did, of itself, work a dissolution of all commercial partnerships, existing at the time, between British subjects and American citizens. By dealing with either party, no third person could acquire a legal right against the other, because one alien enemy cannot in that capacity make a private contract binding upon the other. This conclusion would seem to be an inevitable result from the new relations created by the war. It is a necessary consequence of the other proposition that it is unlawful to have communication or trade with an enemy. To suppose a commercial partnership (such as this was) to be continued, and recognized by law as subsisting, when the same law had severed the subjects of the two countries, and declared them enemies to each other, is to suppose the law chargeable with inconsistency and absurdity. For what use or purpose could the law uphold such a connection, when all further intercourse, communication, negotiation, or dealing between the partners was prohibited, as unlawful? Why preserve the skeleton of the firm, when the sense and spirit of it has fled, and when the execution of any one article of it by either, would be a breach of his allegiance to his country? In short, it must be obvious to every one, that a state of war creates disabilities, imposes restraints, and exacts duties altogether inconsistent with the continuance of that relation."

The Supreme Court of the United States, in holding that the statute of limitations was suspended during the Civil War as against a citizen

of Arkansas, in a cause of action by a citizen of New Hampshire, speaking by Mr. Justice Clifford, in Hanger v. Abbott, 6 Wall. 532, at page 535 (18 L. Ed. 939), said:

"Partnership with a foreigner is dissolved by the same event which makes him an alien enemy, because there is in that case an utter incompatibility created by operation of law between the partners as to their respective rights, duties, and obligations, both public and private, which necessarily dissolves the relation, independent of the will or acts of the parties."

And on page 536 of 6 Wall. (18 L. Ed. 939):

"Executory contracts also with an alien enemy, or even with a neutral, if they cannot be performed except in the way of commercial intercourse with the enemy, are dissolved by the declaration of war, which operates for that purpose with a force equivalent to an act of Congress."

See U. S. v. Grossmayer, 9 Wall. 72, 19 L. Ed. 627; Insurance Co. v. Davis, 95 U. S. 425, 24 L. Ed. 453.

This is the rule adopted by the English courts, and recent expression of it may be found in Stevenson & Co., Ltd., v. Aktiengesellschaft for Cartonnagen Industrie, [1918] App. C. 239; Zinc Corporation v. Hirsch, [1916] 1 K. B. 541; Ertel Bieber & Co. v. Rio Tinto Co., [1918] App. C. 260.

Reference to the recent case of Mayer v. Garvan, Alien Property Custodian, et al. (D. C.) 270 Fed. 229, is decisive of the proposition under discussion, as well as of the issues in these cases, for the facts there were similar to the facts here, and Judge Bingham not only followed the rule laid down in the cases above cited, but answered the contention made by the defendant, which is the same contention as is made here.

The government contends that the rule of law under discussion is of no force here, because the partnership was organized under German law, had its principal place of business in Germany, and the American assets were held for the benefit of the partnership, and hence the partnership contract was a German contract, and that, under the German law, war did not dissolve the partnership, even though some of the partners were subjects of enemy nations. It is a sufficient answer to these contentions to say that, even though the premises of the proposition be true, the conclusion stated does not necessarily follow, and Judge Bingham answers the government's contention in the Mayer Case, supra, on page 237, in the following language:

"The parties, on entering into the contract of partnership which provided for the establishment of an American house, must have understood that if the continuation of the contract, so far as it related to the American partner and the business conducted here, was, in case of war, a violation of the laws of this country, it could not be enforced here as an operative agreement. But whatever they thought about it and notwithstanding the partnership was not dissolved under the German law by the outbreak of war, it was under the law of the United States, for its laws do not sanction the continuation of business relations between its citizens and citizens of a nation with which it is at war. The Kensington, 183 U. S. 263, 269, 22 Sup. Ct. 102, 46 L. Ed. 190, and cases above cited."

It is a controlling principle of private international law that the law of the place where a contract is made will not be applied by the courts

of this country, when to do so would violate a rule of policy as declared by our own courts and our own Legislatures. The rules governing the relations between our citizens and those of a state with which we are at war are in a peculiar degree dictated by public policy, and with such rules the law of the enemy country cannot be permitted to interfere. Our policy has been developed in the cases cited, but it is more strongly shown by the act of Congress under which these suits were brought, the provisions of which, heretofore referred to, show that it is unlawful to trade with or even to send a letter to an enemy or to an ally of an enemy. As Chancellor Kent holds, the declaration of war makes the continuation of a partnership a practical impossibility. That our courts will not apply a foreign law, when to do so will violate our own policy, was held in The Kensington, 183 U. S. 263, 22 Sup. Ct. 102, 46 L. Ed. 190; Mayer v. Garvan et al., supra.

The same rule pertains in England and it was clearly set forth in Ertel Bieber Co. v. Rio Tinto Co., [1918] App. Cas. 260, where the question was raised as to the rights, during the World War, of an English firm under an executory contract claimed to have been made in Germany and to be performed in Germany. On page 293 the court said that the German Courts—

"might decide that the existence of the suspensory clause and the continuance of the contract after the war were not against German public policy. But they could not determine in such a way as to bind an Englishman in an English Court that such a clause with these effects was not against English public policy and therefore binding on an English subject."

On page 302, Lord Parker said:

"If the policy of our law renders it unlawful for a subject of the crown to contract with a foreigner that if war break out between this country and the state of which the foreigner is a subject the latter shall be idemnified against or be relieved from or receive compensation for a loss which he would otherwise incur, no subject of the crown can be allowed to evade the rule by entering into such a contract out of the jurisdiction and stipulation expressly or impliedly that the contract shall be governed by a foreign law. The late Mr. Westlake sums up the law on this point in the following proposition (Private International Law [4th Ed.] § 215) : 'Where a contract conflicts with what are deemed in England to be essential public or moral interests, it cannot be enforced here notwithstanding that it may have been valid by its proper law.' "

And on page 303 :

"The force majeure clause in the contract in question, even if valid according to German law must be held void in the courts of this country, as contravening a general rule of public policy."

The government relies upon King v. Sarria, 69 N. Y. 24, 25 Am. Rep. 128. There it was held that a contract of limited partnership made in a foreign country, valid under its laws and not repugnant to the law and policy of New York, is enforceable in the courts of New York. It was further held that some of the dealings in New York state of a special partnership located in Cuba were governed by the Cuban law. But these conclusions were based expressly on the fact that the rule in Cuba was not contrary to the law and policy of the

state of New York. Indeed, the court said of the foreign law there under discussion, on page 31 of 69 N. Y. (25 Am. Rep. 128):

"It much resembles our own statute for the formation of limited partnerships, and, with some difference in detail, it aims at the same beneficial result, which ours has in view."

Hence the conclusion is imperative that the argument there relied upon is not applicable to the instant case. The claim that the partnership under consideration was an "enemy" within the meaning of section 2 of the act is disposed of by the holding, above stated, that the firm or partnership was dissolved by operation of law upon the declaration of war with Germany.

[2, 3] The partnership having been dissolved then the question remains whether the plaintiffs are entitled to the relief prayed for and may recover each a one-seventh share of the assets of the former firm which assets are now in the hands of the Treasurer of the United States. The partnership agreement shows that each partner was entitled to a one-seventh share in the profits of the enterprise and it appeared in evidence that each of the five German partners had a one-seventh "interest in the partnership," thus leaving two-sevenths to be equally divided between these two plaintiffs. Inasmuch as the partnership agreement does not expressly state how the assets, other than profits, shall be divided upon dissolution, we are compelled to look to the general law of partnership to determine how the assets shall be divided in case of dissolution, when the agreement itself is silent in respect thereto, and under that law the presumption is that the partners share equally. Lindley on Partnership, p. 349; Farrar v. Boswick (1836) 1 Moody & Robinson, 527; Jackson v. Crapp, 32 Ind. 422. In Peacock v. Peacock, 16 Vesey, 49, it was held that—

"As no distinct share was ascertained by force of any express contract between them, they must of necessity be equal partners, if partners in anything."

From the evidence I find that the firm has no debts. It appears that all the German partners have been made parties defendant at the suggestion of counsel for the government, and that, pursuant to order of notice made by this court, they have all been served with notice of the pendency of these suits, and have, through counsel, entered their appearance in court, and filed their consents to the entry of the decree prayed for. Such being the fact, the Alien Property Custodian and the Treasurer of the United States will be fully protected by a judgment in favor of the plaintiffs. The German partners will be bound by such judgment, and no other rights are involved.

The real estate in Mystic, Conn., may be transferred to the plaintiffs, an undivided one-half share to each, and one-half of the value of said real estate, as found above, less the value of an undivided one-seventh thereof, to wit, $4,732.14, may be charged against the share of each plaintiff, to be delivered to him in accordance with this opinion. As to the cash and Liberty Bond, counsel agreed, in case judgment should be rendered for plaintiffs, that one-seventh of the property, constituting the trust in the hands of the Treasurer of the United

States, should be turned over to each plaintiff, and that this should include, as to each, one-seventh of all the income derived from the property constituting said trust, "No. 2692—Gebruder Rossie," to the date of delivery.

Judgment for each plaintiff in accordance with this opinion.

Decree accordingly.

⬤⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes