# THE KENSINGTON.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND
CIRCUIT.

No. 15.  Argued January 17, 1901.—Decided January 6, 1902.

"The Kensington," a steamer transporting passengers from Antwerp to
New York, took on board at Antwerp, as such passengers, the petitioners
in this case, and, in receiving them and their luggage, gave them a ticket
containing, among other things, the following: (c) The shipowner or
agent are not under any circumstances liable for loss, death, injury or
delay to the passenger or his baggage arising from the act of God, the
public enemies, fire, robbers, thieves of whatever kind, whether on board
the steamer or not, perils of the seas, rivers or navigation, accidents to
or of machinery, boilers or steam, collisions, strikes, arrest or restraint
of princes, courts of law, rulers or people, or from any act, neglect or
default of the shipowner's servants, whether on board the steamer or not
or on board any other vessel belonging to the shipowner, either in mat-
ters aforesaid or otherwise howsoever. Neither the shipowner nor the
agent is under any circumstances or for any cause whatever or however
arising liable to an amount exceeding 250 francs for death, injury or de-
lay of or to any passenger carried under this ticket. The shipowner will
use all reasonable means to send the steamer to sea in a seaworthy state
and well-found but does not warrant her seaworthiness. (d) The ship-
owner or agent shall not under any circumstances be liable for any loss
or delay of or injury to passengers' baggage carried under this ticket
beyond the sum of 250 francs at which such baggage is hereby valued,
unless a bill of lading or receipt be given therefor and freight paid in ad-
vance on the excess value at the rate of one per cent or its equivalent in
which case the shipowner shall only be responsible according to the
terms of the shipowner's form-of cargo bill of lading, in use from the
port of departure. There was no proof specially tending to show that
at the time the ticket was issued the attention of the travellers was called
to the fact that it embodied exceptional stipulations relieving the com-
pany from liability, or that such conditions were agreed to. Held:
(1) Following the courts below, that the loss must be presumed to have
     arisen from imperfect stowage:
(2) That testing the exemptions in the ticket by the rule of public policy,
     they were void:
(3) That the arbitrary limitation of 250 francs to each passenger, unac-
     companied by any right to increase the amount by an adequate and
     reason-able proportional payment, was void.

THE libel by which this action was commenced sought to recover the value of passengers' baggage which it was alleged the ship had wrongfully failed to deliver. The facts essential to be borne in mind in order to approach the questions arising for decision are as follows:

The International Navigation Company, a New Jersey corporation, on December 6, 1897, at the office of its Paris agency, issued to Mrs. and Miss Bleecker, the wife and daughter of an officer of the United States Navy, a steamer ticket for a voyage from Antwerp to New York on the Kensington, a steamer in the control of the company, advertised to sail from Antwerp on December the 11th. The ticket was delivered to Mrs. Bleecker, who at the time made part payment of the passage money. The baggage of the two passengers was shipped by rail to Antwerp, to the care of the agent of the company there. Mrs. Bleecker, at Antwerp, on the 10th of December, paid the remainder of the passage money, and it was entered on the ticket. The baggage having in the meanwhile been received, the charges which the agent at Antwerp had advanced were refunded and a receipt was issued. It was stated therein that the value of the baggage was unknown, and that it was shipped subject to the conditions contained in the company's steamer ticket and bill of lading. Mrs. Bleecker and her daughter embarked, and the steamer sailed on the 11th of December. The ticket was subsequently taken up by the purser.

The baggage was stowed in what was known as number 2, upper steerage deck. The voyage was an exceptionally rough one, the ship encountering heavy seas and winds, rolled from thirty-eight to forty-five degrees on either side during the height of the gale, and was obliged to heave to for about fifteen hours. On arrival at New York the baggage was found to be totally destroyed. By constant shifting it had been reduced to an almost unrecognizable mass, was commingled with débris of broken china and straw, and covered with water. The first was occasioned by stowing crates of china in the same compartment. The presence of the water was explained by the fact that an exhaust pipe which passed through the compartment

had been broken by the shifting of the contents of the compartment, and hence the exhaust escaped into the compartment.

There is no possible view which can be taken of the facts by which the loss of the baggage was brought about by which the ship could be held responsible if the steamer ticket was in and of itself a complete contract, and all the conditions or exceptions legibly printed on the face thereof were lawful. The ticket was signed by the agent of the company as Paris, was countersigned by the agent at Antwerp, but was not signed by either Mrs. Bleecker or her daughter. One of the conditions printed on the ticket provided that there should be no liability to each passenger, "under any circumstances," beyond the sum of 250 francs, "at which such baggage is hereby valued," unless an increased value be declared and an additional sum paid as provided by the condition.

There was no proof tending to show that at the time the ticket was issued the attention of Mrs. Bleecker or her daughter was called to the fact that it embodied exceptional stipulations, relieving the company from liability, or that such conditions were agreed to, except in so far as a meeting of minds on the subject may be inferred from the fact of the delivery of the ticket by the company, and its acceptance, and that it contained on its face, in small but legible type, among others, the stipulations which are relied upon. The testimony of Mrs. Bleecker and her daughter was that when the ticket was received it was put aside without reading it, and that it was not subsequently examined before it was delivered to the ship's officer. The District Court held that the loss of the baggage was attributable to bad stowage; that the ticket and the conditions printed on it were a contract binding upon the parties, so far as the conditions were lawful. The conditions generally relieving from liability for negligence were held to be void, but the stipulation as to the value of the baggage was held valid; recovery was allowed only for the equivalent of 250 francs to each. 88 Fed. Rep. 331.

On appeal, the Circuit Court of Appeals for the Second Circuit affirmed the judgment. 94 Fed. Rep. 885.

The case by the allowance of a writ of certiorari is here for review.

*Mr. Roger Foster* for petitioners.

*Mr. Henry Galbraith Ward* for respondent.

MR. JUSTICE WHITE, after making the foregoing statement, delivered the opinion of the court.

The District Court held, although the condition of the weather might account for the shifting of the baggage, that result could also have arisen from its bad stowage, and in the absence of all proof by the ship that the baggage had been properly stowed, when such proof was peculiarly within its reach, the loss must be presumed to have arisen from the imperfect stowage. The Circuit Court of Appeals, whilst in effect agreeing to this conclusion, in addition found that there was proof in the record tending to sustain the conclusion that the baggage had been improperly stowed, and that no proof even tending to rebut this testimony had been offered by the company. As in the argument at bar the conclusion of the court below on this subject was not seriously questioned, we content ourselves with saying that as a matter of fact we find them to be sustained, and therefore pass from their further consideration.

The loss of the baggage being then attributable to improper stowage, the question is, Was the vessel relieved from the consequence of its fault by the exceptions contained in the passenger ticket? The District Court decided "that a ticket of the character described for a transatlantic passage is a unilateral contract; and, like a bill of lading, is binding upon the person who receives it, so far as its provisions are reasonable and valid." In other words, the court held, although there was no proof of the meeting of the minds of the parties upon the subject of exceptional limitations to be imposed upon the contract of carriage, the receipt and retention of the ticket implied a unilateral contract embracing the exceptions found in legible characters on the face of the ticket. And being thus a part of the express and written contract, the exceptions would be enforced provided they were just and reasonable. The Circuit Court of Appeals in effect approved these views of the District Court.

Whilst apparently the question whether there was a unilateral contract necessarily arises first for consideration, such is not the case when the situation of the record is taken into view. For should we, in disposing of this question, determine that the rulings of the court below as to the unilateral contract were correct, we would not thereby be relieved from deciding whether the conditions embodied in the contract were valid. On the other hand, should we conclude that the conditions relied on were void, there will be no occasion to determine the question of contract. We hence invert the logical order of consideration, and first come to determine whether the conditions enumerated in the ticket relieved from the responsibility otherwise resulting from the bad stowage of the baggage. In doing so we shall, of course, assume, for the purpose of this branch of the case only, that the conditions relied upon were a part of a unilateral contract, and were binding as far as they were just and reasonable. It is apparent if the carrier, in transporting the baggage, was governed by the act of February 13, 1893, c. 105, designated as the Harter Act, any provision in the ticket exempting from liability for fault in loading or stowage was void because inhibited by the express provisions of the statute. 27 Stat. 445. As, however, the view which we take of the conditions expressed in the ticket will be equally decisive, whether or not the Harter Act concerns the carriage of passengers and their baggage, it becomes unnecessary to intimate any opinion as to whether the provisions of the act in question apply to such contracts. The exceptions found on the face of the ticket upon which the carrier depends are as follows:

"(c.) The shipowner or agent are not under any circumstances liable for loss, death, injury or delay to the passenger or his baggage arising from the act of God, the public enemies, fire, robbers, thieves of whatever kind, whether on board the steamer or not, perils of the seas, rivers or navigation, accidents to or of machinery, boilers or steam, collisions, strikes, arrest or restraint of princes, courts of law, rulers or people, or from any act, neglect or default of the shipowner's servants, whether on board the steamer or not, or on board any other vessel belonging to the shipowner, either in matters aforesaid

or otherwise howsoever. Neither the shipowner nor the agent is under any circumstances, or for any cause whatever or however arising, liable to an amount exceeding 250 francs for death, injury or delay of or to any passenger carried under this ticket. The shipowner will use all reasonable means to send the steamer to sea in a seaworthy state and well-found, but does not warrant her seaworthiness.

" (d.) The shipowner or agent shall not under any circumstances be liable for any loss or delay of or injury to passengers' baggage carried under this ticket beyond the sum of 250 francs, at which such baggage is hereby valued, unless a bill of lading or receipt be given therefor and freight paid in advance on the excess value at the rate of one per cent, or its equivalent, in which case the shipowner shall only be responsible according to the terms of the shipowner's form of cargo bill of lading, in use from the port of departure."

It is settled in the courts of the United States that exemptions limiting carriers from responsibility for the negligence of themselves or their servants are both unjust and unreasonable, and will be deemed as wanting in the element of voluntary assent; and, besides, that such conditions are in conflict with public policy. This doctrine was announced so long ago, and has been so frequently reiterated, that it is elementary. We content ourselves with referring to the cases of the *Baltimore & Ohio &c. Railway* v. *Voigt*, 176 U. S. 498, 505, 507, and *Knott* v. *Botany Mills*, 179 U. S. 69, 71, where the previously adjudged cases are referred to and the principles by them expounded are restated.

True it is that by the act of February 13, 1893, 27 Stat. 445, known as the Harter Act, already adverted to, the general rule just above stated was modified so as to exempt vessels, when engaged in the classes of carriage coming within the terms of the statute, from liability for negligence in certain particulars. But whilst this statute changed the general rule in cases which the act embraced, it left such rule in all other cases unimpaired. Indeed, in view of the well-settled nature of the general rule at the time the statute was adopted, it must result that legis-

lative approval was by clear implication given to the general rule as then existing in all cases where it was not changed.

Testing the exemptions found in the ticket by the rule of public policy, it is apparent that they were void, since they unequivocally sought to relieve the carrier from the initial duty of furnishing a seaworthy vessel for all neglect. in loading or stowing, and indeed for any and every fault of commission or omission on the part of the carrier or his servants. And seeking to accomplish these results, it is equally plain that the conditions were void if their legality be considered solely with reference to the modifications of the general rule created by the act of 1893. *Knott* v. *Botany Mills, supra.* As, however, the ticket was finally countersigned in Belgium, and one of the conditions printed on its face provides that "all questions arising hereunder are to be settled according to the Belgium law, with reference to which this contract is made," it is insisted that such law should be applied, as proof was offered showing that the law of Belgium authorized the conditions. The contention amounts to this : Where a contract is made in a foreign country, to be executed at least in part in the United States, the law of the foreign country, either by its own force or in virtue of the agreement of the contracting parties, must be enforced by the courts of the United States, even although to do so requires the violation of the public policy of the United States. To state the proposition is, we think, to answer it. It is true, as a general rule, that the *lex loci* governs, and it is also true that the intention of the parties to a contract will be sought out and enforced. But both these elementary principles are subordinate to and qualified by the doctrine that neither by comity nor by the will of contracting parties can the public policy of a country be set at naught. Story, Conflict of Laws, §§ 38, 244. Whilst as said in *Knott* v. *Botany Mills,* the previous decisions of this court have not called for the application of the rule of public policy to the precise question here arising, nevertheless, that it must be here enforced is substantially determined by the previous adjudications of this court. In *Liverpool & Great Western Steam Co.* v. *Phœnix Insurance Co.,* 129 U. S. 397, the question arose, whether conditions, exempting a

carrier from responsibility for loss caused by the neglect of himself, or his servants, could be enforced in the courts of the United States, the bill of lading having been issued in New York by a British ship for goods consigned to England. Despite the fact that conditions, exempting from responsibility for loss, arising from negligence, were valid, by the laws of New York, and would have been upheld in the courts of that State, it was decided that, in view of the rule of public policy applied by the courts of the United States, effect would not be given to the conditions. In the very nature of things, the premise, upon which this decision must rest, is controlling here, unless it be said that a contract, made in a foreign country, to be executed in part in the United States, is more potential to overthrow the public policy, enforced in the courts of the United States, than would be a similar contract, validly made, in one of the States of the Union. Nor is the suggestion that, because there is no statute expressly prohibiting such contracts, and because it is assumed no offence against morality is committed in making them, therefore they should be enforced, despite the settled rule of public policy to the contrary. The existence of the rule of public policy, not the ultimate causes upon which it may depend, is the criterion. The precise question has been carefully considered and decided in the District Courts of the United States. In *The Guild Hall*, 58 Fed. Rep. 796, it was held that a stipulation in a bill of lading issued at Rotterdam on goods destined to New York, exempting the carrier from liability for negligence, would not be enforced in the courts of the United States, although such a condition was valid under the law of Holland. In *The Glenmavis*, 69 Fed. Rep. 472, the same rule was applied to a bill of lading issued in Germany by a British ship for goods consigned to Philadelphia. Indeed by implication the question is controlled by statute. We have previously pointed out, under the assumption that the Harter Act does not apply to the carriage of the baggage of a passenger, that such law, in effect, affirms the rule of public policy as previously existing in the cases, where no change was made. But that act expressly prohibits carriers, engaged in the business which it regulates, from contracting,

even in a foreign country, for a shipment to the United States to relieve themselves from negligence in cases where the statute does not do so. *Knott* v. *Botany Mills, ub. sup.* The theory then, by which alone the conditions relied on in this case can be enforced despite the public policy which governs, in the courts of the United States, reduces itself to this: Carriers who transact a class of business where they are exempt by law, in many cases, from the consequences of the neglect of themselves, or their servants, may not overthrow public policy by contracts made in a foreign country for a shipment to the United States, but carriers who are in no case exempt by the law from the consequence of their neglect may do so. But this amounts in last analysis to this: The lesser the immunity from negligence the greater the power to avoid the consequences of negligence.

The general exemptions, from responsibility for negligence which the ticket embodies being controlled by the rule enforced in the courts of the United States, and being therefore void, because against public policy, we come to consider the particular provisions contained in the ticket with reference to the value of the baggage and the limit of recovery, if any, arising therefrom.

In *Railroad Company* v. *Fraloff*, 100 U. S. 24, 27, it was said:

"It is undoubtedly competent for carriers of passengers, by specific regulations, distinctly brought to the knowledge of the passenger, which are reasonable in their character and not inconsistent with any statute or their duties to the public, to protect themselves against liability, as insurers, for baggage exceeding a fixed amount in value, except upon additional compensation, proportioned to the risk. And in order that such regulations may be practically effective, and the carrier advised of the full extent of its responsibility, and, consequently, of the degree of precaution necessary upon its part, it may rightfully require, as a condition precedent to any contract for the transportation of baggage, information from the passenger as to its value; and if the value thus disclosed exceeds that which the passenger may reasonably demand to be transported as baggage

without extra compensation, the carrier, at its option, can make such additional charge as the risk fairly justifies."

In *Hart* v. *Pennsylvania Railroad Co.*, 112 U. S. 331, the facts were as follows: A bill of lading was issued for a number of horses, and the instrument was signed, not only by the carrier, but also by the shipper. By the express provisions of the bill of lading the right to recover for each horse was limited to a specified sum. The horses were injured while in transit by the neglect of the employés of the company, and recovery was sought for a much larger amount than the value fixed in the bill of lading. The court, in its opinion, stated that it must be assumed that the rate of freight and the declared valuation had a due relation one to the other, and that if a greater value had been declared a higher and not unreasonable charge for the carriage would have been made. It was conceded that the carrier was liable for the value of the horses as stated in the bill of lading, but the controversy was whether the limit affixed in the bill of lading should not be disregarded and a much larger sum, which it was asserted was the actual value of the horses, be awarded on the ground that the loss was begotten through the negligence of the carrier. The court, after reviewing the prior cases and explicitly reaffirming the doctrine that conditions were void, because against public policy, by which a carrier was relieved from the consequences of the negligence of himself or his servants, said (p. 340):

" The limitation as to the value has no tendency to exempt from liability for negligence. It does not induce want of care. It exacts from the carrier the measure of care due to the value agreed on. The carrier is bound to respond in that value for negligence. The compensation for carriage is based on that value. The shipper is estopped from saying that the value is greater. The articles have no greater value, for the purposes of the contract of transportation, between the parties to that contract. The carrier must respond for negligence up to that value. It is just and reasonable that such a contract, fairly entered into and where there is no deceit practiced on the shipper, should be upheld. There is no violation of public policy. On the contrary, it would be unjust and unreasonable, and would

be repugnant to the soundest principles of fair dealing and of the freedom of contracting, and thus in conflict with public policy, if a shipper should be allowed to reap the benefit of the contract if there is no loss, and to repudiate it in case of loss."

It was decided that the carrier was responsible, but his liability was limited to the value expressly agreed upon in the bill of lading. Did the conditions in the steamer ticket in the case at bar come within the principle announced in either of the foregoing cases?

One of the conditions reiterated in various forms, in the bill of lading, is as follows:

" The shipowner or agent shall not under any circumstances be liable for any loss or delay of or injury to passenger's baggage carried under the ticket, beyond the sum of 250 francs, at which such baggage is hereby valued, unless a bill of lading or receipt be given therefor and freight paid in advance on the excess value at the rate of 1 per cent, or its equivalent, in which case the shipowner shall only be responsible according to the terms of the shipowner's form of cargo bill of lading in use from the port of departure."

The requirement, then, was that the baggage of the passenger must be valued at 250 francs, and no more than that sum could be recovered under any circumstances, unless any excess of amount be declared and a named percentage on the increased value be paid, and unless the passenger agreed to ship his baggage as cargo and take a bill of lading for it. Now the only theory upon which it can be assumed that the law of 1893, the Harter Act, does not apply to the carriage of the baggage of a passenger, is that the statute in question only relates to merchandise shipped as cargo and for which a bill of lading is taken. The requirement, therefore, if the passenger desired to value his baggage at a greater sum than 250 francs, was that he must ship it in such a manner as to bring it within the terms of the Harter Act. This obvious meaning of the condition is stated and insisted on in the brief in behalf of the carrier, where it is said:

" The ticket in this case certainly does not fall within the words ' bill of lading or shipping document,' used in sections 1,

2 and 4 of the Harter Act. These are expressions perfectly well understood in commerce, and apply to bills of lading covering trade shipments, which are almost invariably insured. That Congress meant by the words 'bill of lading or shipping document' but one thing, namely, bill of lading, appears from the refusing to issue on demand 'the bill of lading herein provided for,' and does not mention the words 'shipping document' at all.

" On the other hand, for personal baggage accompanying the passenger no bill of lading or shipping document is, so far as we know, ever given. If the libellants had intended their personal baggage to fall within the provisions of the Harter Act, they could have accomplished it, as provided in the ticket itself, by declaring the value of the baggage over 250 francs, paying freight on the excess and getting a bill of lading."

The passenger then was subjected to the inevitable alternative of having no recourse whatever for his baggage beyond the value of 250 francs, unless he agreed that he would subject it to the Harter Act. But if that law was made applicable its provisions controlled, and therefore the carrier became entitled to all the benefits of the third section of the act, exempting from all loss or damage resulting from faults or errors in navigation or in the management of the vessel, and for other causes which are specified in the section in question. To make this exaction was consequently but in effect to demand that the passenger agree, as a prerequisite to any increased valuation of his baggage, to subject it to a risk of loss brought about by the negligence of the carrier, when otherwise the baggage would not have been submitted to risk arising from such neglect—an obvious requirement exempting the carrier from the consequences of his own negligence. On the other hand, if the assumption be indulged in that the baggage of the passenger was within the purview of the Harter Act, a stipulation embodied in another provision of the ticket, relieving the carrier under any and every circumstance from every conceivable neglect of his servants, " either in matters aforesaid or otherwise howsoever," was a plain violation of the prohibitions contained in the second section of the Harter Act. It follows, if the Harter Act

did not apply to the baggage of a passenger, the stipulation which compelled the passenger, if he wished to value his baggage, to agree to subject it to that act, was an illegal effort on the part of the carrier to relieve himself from liability for his negligence. If this result is escaped by treating the baggage of. the passenger as within the scope of the Harter Act, then there are provisions found in the ticket which are void, because they contain stipulations for immunity from negligence which are in direct conflict with the prohibitions of that act. Indeed, the conditions contained in the ticket seem to have been devised —at all events, they lend themselves to the inference that they were devised—to so operate as to keep the baggage of the passenger outside of the scope of the Harter Act, in order to avoid the provisions of that act forbidding the insertion of certain conditions as to negligence, and when this result was obtained to immediately secure the bringing of the passenger's baggage within the influence of the act for the purpose of enabling the carrier to enjoy the immunity from negligence which that act accords in certain cases. We think the conditions were unjust and unreasonable and void because in conflict with public policy. And if the considerations which have led us to this conclusion be for a moment put aside, it is far from clear that other conditions contained in the ticket would not, from another point of view, lead to the same result. In addition to the exaction with which the right to state an excess of value over 250 francs was burdened, the ticket contains a provision to the effect that, whatever be the value of the baggage, under no circumstances will the carrier be liable for the neglect of himself or his servants. Giving effect, then, to all the provisions of the ticket, it may be doubted whether it does not result from them that not only was the baggage when valued at 250 francs, but also when valued at any increased amount, subjected to any and every risk arising from the negligence of the carrier or his servants.

It remains only to consider whether, although the conditions found in the ticket be void because against public policy, recovery for the baggage lost must be limited to the sum of 250 francs because of the statement of that amount in one of the

provisions of the ticket.    It is to be doubted whether in reason it can be said that the limit as fixed in the ticket can be separated from the context in which it is found, and be deemed to be an independent valuation fixed by the parties irrespective of the right to name an increased sum stated in the same provision of the ticket which contains the valuation.    But if it can be treated as a separate valuation, unaccompanied by the conditions attached to it, and from which it takes its origin, then the question is this : Is it just and reasonable for a transatlantic carrier to put an absolute limit of 250 francs, about the equivalent of $50, as the value of the baggage of a cabin passenger, whether first or second class, and to refuse, except upon illegal conditions, to allow any greater sum to be carried as baggage ? In *The Majestic*, 166 U. S. 375, the liability of the ship for baggage was under consideration.    No contention was made that the ticket was not a contract, but the question was whether the conditions printed on the back were a part of the assumed contract and, if so, were they valid.    One of the conditions limited recovery to £10 for each passenger, unless a greater sum was declared and paid for.    The right to declare the larger value was not burdened with the illegal condition found in the ticket now under consideration.    Had it been otherwise, the requirement would not have had the same significance, as the ticket considered in *The Majestic* was issued prior to the adoption of the Harter Act, and, therefore, whether the baggage was carried as such, or as cargo, it would have equally enjoyed an immunity from loss, brought about by the negligence of the carrier, or his servants.    The ticket considered, in *The Majestic* as does the one now before us, allowed a capacity of "twenty cubical feet of luggage for each person."    The court, in *The Majestic*, commenting on the restriction to £10 for each passenger, said it was a (p. 386) "limitation which, we must say, does not strike us as exactly reasonable, in view of the 'twenty cubical feet of luggage which the company had expressly contracted to carry.' . . ."    It was decided, in *The Majestic*, that, even on the hypothesis of a contract, evidenced by the ticket, the conditions on the back were not binding.    The present case does not require us to decide whether the sum of 250

francs would be a reasonable limit if the right to fix a larger amount was not incumbered with the illegal and arbitrary conditions which are here presented. We express no opinion on such question. Manifestly, what is a reasonable maximum amount when a larger value is allowed to be carried as baggage by paying an additional compensation, is a different question from what is a reasonable amount where the right to declare and pay for a larger sum is refused, or what is equivalent thereto is permitted only upon condition that the passenger subjects himself to conditions which are void as against public policy. Indeed, the Circuit Court of Appeals adverted, in its opinion in this case, to the suggestion made in *The Majestic*, and said that the limit of 250 francs was reasonable, because of the right given the passenger to increase the amount by paying a larger but reasonable compensation. As we hold that no such right was allowed because its enjoyment was burdened with conditions which were void because against public policy the only reason upon which the justness of the limit was sustained ceases to apply.

In view of the nature and duration of the voyage, of the circumstances which may be reasonably deemed to environ transatlantic cabin passengers, and the objects and purposes which it may also be justly assumed the persons who undertake such a voyage have in view, we think the arbitrary limitation of 250 francs to each passenger, unaccompanied by any right to increase the amount by an adequate and reasonable proportional payment, was void. It is therefore unnecessary to decide whether the ticket delivered and received, under circumstances disclosed by the record, gave rise to a contract embracing the exceptions to the carrier's liability, which were stated on the ticket. We intimate no opinion on the subject.

*The decree below must be reversed and the cause remanded to the District Court with directions to ascertain the actual damage sustained by the libellants, and to enter a decree in their favor for the amount of such damages, with interest and costs: and it is so ordered.*