[Civil No. 2444. Filed June 14, 1926.]

[247 Pac. 117.]

# FERNANDO VEYTIA, Appellant, v. J. G. AL-VAREZ, Appellee.

1. CONTRACTS—PUBLIC POLICY WILL NOT JUSTIFY REFUSAL TO EXTEND COMITY AND ENFORCE CONTRACT, VALID WHERE MADE, UNLESS CONTRACT IS INHERENTLY PERNICIOUS AND SHOCKING TO PREVAILING MORAL SENSE.—Public policy will not justify refusal of court to extend comity and enforce a contract, valid where made, unless the transaction involved is inherently vicious, wicked, immoral, or so pernicious and detestable as to shock the prevailing moral sense.

2. INTOXICATING LIQUORS — LIABILITY OF PURCHASER OF LIQUOR IN MEXICO, RESIDENT OF ARIZONA, HELD ENFORCEABLE IN COURTS OF ARIZONA (U. S. CONST., AMEND. 18; VOLSTEAD ACT [U. S. COMP. STATS. ANN. SUPP. 1923, § 10138¼ ET SEQ.]).—Purchase of liquor in Mexico by resident of Arizona is not so inherently vicious or immoral as to justify courts of Arizona in refusing on ground of public policy to enforce purchaser's liability for purchase price,

---

2. Enforcing foreign contract valid where made for sale of intoxicating liquor, see note in 49 A. L. R. 1002. See, also, 5 R. C. L. 945.

notwithstanding the Eighteenth Amendment and Volstead Act (U. S. Comp. Stats. Ann. Supp. 1923, § 10138¼ et seq.) make such contracts in United States unenforceable.

---

See (1) 13 **C. J.**, p. 256, n. 76 New.   (2) 33 **C. J.**, p. 662, n. 75 New.

APPEAL from a judgment of the Superior Court of the County of Santa Cruz. W. A. O'Connor, Judge. Judgment reversed.

Messrs. Noon & Noon, for Appellant.

Messrs. Hardy & Hardy, for Appellee.

JONES, Superior Judge.—This is an appeal from a judgment for the defendant upon an order sustaining a demurrer to the plaintiff's complaint, alleging that plaintiff, a resident of Mexico, sold and delivered in Mexico to the defendant, a resident of Arizona, a quantity of intoxicating liquor for which the defendant failed to pay, and prayed judgment for the price of the liquor. That neither of the parties contemplated the violation of any law of the United States or the state of Arizona and that the contract was valid in Mexico was admitted.

Recognizing the general rule that contracts, valid where made, are on principles of comity upheld elsewhere, the defendant (appellee) contends that he may escape payment because, he says, judicial compulsion would be in contravention of the public policy of this country and state as expressed by the Eighteenth Amendment, the Volstead Act (U. S. Comp. Stats. Ann. Supp. 1923, § 10138¼ et seq.), and the state constitutional and statutory provisions against the sale, manufacture, etc., of intoxicating liquors.

In reaching our conclusion, we have put aside as inapposite cases in which the contract by its terms contemplated part performance at or pursuant to the laws of the *locus fori,* or where the parties

planned the circumvention of the laws of the forum, and confined our consideration of the authorities to the determination of the proper limitations upon the general rule where a sale is made under the circumstances just related. Our conclusion is that there is no public policy that will justify the refusal of a court to extend comity under such a state of facts, unless the transaction involved is regarded in the exercise of a judicial discretion as inherently vicious, wicked or immoral, or (what is probably the same thing) where the judicial enforcement of such contract would present to our people an example pernicious and detestable—shocking to the prevailing moral sense, to use the language of other courts.

We have discovered very few authorities involving sales, but such limitations are the only ones recognized in a variety of situations.

A translated extract from Huberus, an early European writer, found in a note on page 642 of 1 L. Ed., reads as follows:

"What we have said with respect to wills applies equally to conveyances to take effect during the life of the grantor: Provided a contract is made according to the law of the place, in which it is entered into, throughout, in court, and out of court, even in those places where such a mode of contracting is not allowed, it will be supported. For example: In a certain place particular kinds of merchandise are prohibited, if sold there the contract is void—but, if the same merchandise were sold elsewhere, in a place where there was not any prohibition, and a suit is brought in a place where they were prohibited, the purchaser will be condemned, and the suit maintained, because the contract was good in its origin, where made."

In *Commonwealth of Kentucky* v. *Bassford,* 6 Hill (N. Y.), 526, the state of Kentucky sought to enforce in the courts of New York a bond given by the defendants in Kentucky upon the purchase of a lottery

there validly conducted. Lotteries were prohibited by the laws of New York. Said the court:

"True, as foreign laws are of no efficacy here *ex proprio vigore,* but by comity only, our courts may and ought to determine in each case how far that comity shall extend. If the law sanction what is plainly contrary to morality, the public rights, etc., the courts of this state will not aid in administering it. Story on Conflict of Laws, 213, § 258. But I do not regard the one in question as falling within this class of excepted cases, any more than a foreign law allowing interest on money beyond the rate established by our own statute. *Andrews* v. *Pond,* 13 Peters (U. S.), 65, 10 L. Ed. 61 (see, also, Rose's U. S. Notes). Indeed, the policy of raising money by lottery for public purposes, such as for literary and benevolent institutions, continued to prevail in this state until 1833 (Session Laws of 1833, p. 484), though before prohibited as unwise and inexpedient in the Constitution of 1821, so far as respected the future power of the Legislature. Const. of N. Y. art. 7, § 11. It would be rather ungracious for our courts, under these circumstances, to refuse to uphold the contract in question, within the rule of comity, on the ground that it was founded in moral turpitude."

A New Jersey court, however, refused to take jurisdiction of a bill for accounting of a partnership which had lawfully conducted lotteries in other states. It was pointed out that for more than seventy years lotteries had been prohibited from operating in New Jersey by a statute that condemned them "wherever situated," and they were characterized as "judicially, if not abstractly in ethics, *mala in se,*" and thus condemned by the maxim *ex turpi causa non oritur actio. Watson* v. *Murray,* 23 N. J. Eq. 257.

In *Greenwood* v. *Curtis,* 6 Mass. 358, 4 Am. Dec. 145, plaintiff shipped a cargo of goods from South Carolina to Africa to be exchanged for slaves. Curtis accepted in Africa the cargo, delivered Greenwood some slaves, acknowledged a balance due Greenwood,

and for such balance also executed a promissory note payable in slaves and money. Greenwood sued Curtis in Massachusetts in *assumpsit* on the note and in another form of action on the acknowledged balance due. Accordingly, each count sought the recovery of the same debt.

The court declared that there were two exceptions to the general rule that a contract valid by the *lex loci contractus* should be enforced regardless of the *lex fori,* where "the commonwealth or its citizens may be injured by giving legal effect to the contract by a judgment in our courts," and "when the giving of legal effect to the contract would exhibit to the citizens of the state an example pernicious and detestable." After pointing out that the sale of slaves was . valid in South Carolina and Africa, the court declared that the principle of comity enjoined upon it the duty of enforcing the note and stated account, unless they came within one of the two exceptions. In concluding that the action of *assumpsit* did not fall within the first exception, the court said:

"To maintain action, if it be not within the exceptions, is enjoined on us by the comity we owe another state. And to entitle the defendant to retain in his hands the debt which he justly owes, as between the parties, he ought clearly to show some principle, by which he may defend himself in dishonestly retaining this property. We do not perceive any injury that could arise to the rights or interests of this state or its citizens, if either of the contracts had been faithfully executed agreeably to the terms of it. It was made abroad, by persons not citizens of this commonwealth, and to be executed abroad, having no relation in its consequences to our laws. The defendant therefore, to establish his defense, must bring this case within the second exception; and show that the action, as considered by the laws of this commonwealth, is a *turpis causa,* furnishing a pernicious precedent, and so not to be countenanced. This upon public principles he is authorized to do, notwithstand-

ing he is a party to all the moral turpitude of the contract. The argument is that the transportation of slaves from Africa is an immoral and vicious practice, and consequently that any contract to purchase slaves for that purpose is base and dishonest, and cannot be the foundation of an action here within the principle of comity adopted by the common law. This objection may apply to the counts on the note, but not to the count on the *insimul computassent.*"

With respect to this count, the court, after a review of the facts, held that it was for that part of the cargo delivered to the defendant for which he had not paid, and was consequently not tainted with slavery. Inasmuch as both counts were for the same debt, the plaintiff prevailed.

This case has been erroneously cited as supporting the proposition that courts of this country will recognize the sale of slaves. The contrary is rather suggested. The legislature of Massachusetts, as noted in the opinion, had denounced the slave trade and traders in ringing terms. The court, however, found it unnecessary to decide the question directly, but it did definitely hold that the only ground on which such a contract could be disregarded was that it involved moral turpitude, was a *"turpis causa,* furnishing a pernicious precedent."

An interesting case is *Oscanyan* v. *Winchester Arms Co.,* 103 U. S. 261, 26 L. Ed. 539 (see, also, Rose's U. S. Notes). The plaintiff, a representative of the Turkish government in New York, agreed with the defendant to persuade his principals to give defendant an order for guns and was to receive for such services a percentage of the selling price. Such an order was made, and plaintiff sought to recover on his contract. In refusing to entertain the action, the court said:

"The general rule undoubtedly is that the validity of a contract is to be decided by the law of the place

30 Ariz.—21

where it is made, unless it is to be performed in another country; but to this, as to all general rules, there are exceptions, and among these Story mentions contracts made in a foreign country to promote or reward the commission of crime, to corrupt or evade the due administration of justice, to cheat public agents, or to affect the public rights, and other contracts which in their nature are founded in moral turpitude, and are inconsistent with the good order and solid interest of society. 'All such contracts,' he adds, 'even although they might be held valid in a country where they are made, would be held void elsewhere, or at least ought to be, if the dictates of Christian morality, or even of natural justice, are allowed to have their due force and influence in the administration of international jurisprudence.' Story, Conflict of Laws, § 258."

After some discussion, the court continues:

"In any view of the contract here, whether it would be valid or invalid according to Turkish law and customs, it is intrinsically so vicious in its character and tendency, and so repugnant to all our notions of right and morality, that it can have no countenance in the courts of the United States."

The case of *Klein* v. *Keller,* 42 Okl. 592, Ann. Cas. 1916D 1070, 141 Pac. 1117, is directly in point. There the Oklahoma court sustained an action to recover the price of certain intoxicating liquors validly sold and delivered in another state over the objection that it contravened the public policy of Oklahoma as reflected by its prohibition law. After pointing out that the public policy of the forum should operate to preclude actions upon contracts made elsewhere for the purpose of evading or circumventing the laws of Oklahoma, the court declares that there is no such obstacle in the way of an action where the sale was completely made at another place in accordance with its laws and without any reference whatever to the laws of any other place.

Turning from contracts, we find the interesting case of *Loucks* v. *Standard Oil Co.*, 224 N. Y. 99, 120 N. E. 198, which was brought in the New York court to enforce liability granted by a Massachusetts statute to certain relatives of a decedent whose death in Massachusetts was alleged to be due to the negligence of the defendant. It was insisted that the New York courts could not enforce such statutory liability for several reasons, of which one was that it was contrary to the public policy of the forum. The question was carefully considered and many authorities reviewed. In sustaining the right of action, the court spoke of the "growing conviction that only exceptional circumstances should lead one of the states to refuse to enforce a right acquired in another. The evidences of this tendency are many." The court concluded that, if it be justified in refusing to hear the case, "it must be because the cause of action in its nature offends our sense of justice or menaces the public welfare."

Defendant's counsel undertake to distinguish some of the cases on the ground that the motives of comity among the states are stronger and more compelling than those among the nations, and *Bond* v. *Hume,* 243 U. S. 15, 61 L. Ed. 565, 37 Sup. Ct. Rep. 366 (see, also, Rose's U. S. Notes Supp.), is cited. It is there suggested that such a distinction may be proper. See, however, in this connection *Buckner* v. *Finley,* 2 Pet. (U. S.) 586, 7 L. Ed. 528. But in the cases cited above no point or mention is made thereof.

Defendant urges the following cases to support his position that the public policy of the state and nation precludes our courts from entertaining this case: *The Kensington,* 183 U. S. 263, 46 L. Ed. 190, 22 Sup. Ct. Rep. 102; *Fox* v. *Postal Tel. Co.,* 138 Wis. 648, 28 L. R. A. (N. S.) 490, 120 N. W. 399; *International*

*Harv. Co.* v. *McAdam*, 142 Wis. 114, 20 Ann. Cas. 614, 26 L. R. A. (N. S.) 774, 124 N. W. 1042.

The Kensington is frequently cited, and may be regarded as a leading case. When the opinion is read in the light of the facts, it will be found to support appellee's contention but little. It was an action by a passenger, a citizen of this country, on the "Kensington" from Antwerp to New York. Her ticket was purchased in Europe and contained a stipulation, there valid, that there should be no liability for negligence, which was urged as a defense. The Supreme Court held that it was against public policy and void. As the above review of the facts discloses, and as the opinion points out, part performance of the contract was to be in New York. Manifestly no provision of a contract in contravention of the public policy of this country can be accepted, where it is to be performed here wholly, or in substantial part. This is particularly so under the facts of the "Kensington," where the passenger could have no practical remedy except through the courts of her own country.

*Fox* v. *Postal Tel. Co.*, *supra*, was an action in the Wisconsin courts for the negligent nondelivery of a telegram sent by the plaintiff from New York to Chicago. The defendant pleaded a stipulation on the back of the telegram limiting the company's liability to the cost of the service unless certain requirements were fulfilled. Conceding that the stipulation was valid where made and performed, the court nevertheless refused to enforce the same because it was thought by the court to contravene the public policy of the state, and numerous Wisconsin cases were cited to show that it had long been established in Wisconsin that stipulations against negligence were against public policy.

In the later case of *International Harvester Co.*
v. *McAdam,* the court distinguished the Fox case by
declaring that the provision against liability for negli-
gence had been held void because it was "pernicious"
in character—inherently harmful—characterizations
that were not used in the earlier opinion. The ques-
tion presented in the McAdam case was thus stated
by the court:

"Is a married woman's contract as accommodation
maker of a promissory note, which is valid in the
place where made, enforceable in the courts of this
state, such a contract not being valid if made here?"

In answering that question in the affirmative, the
court *inter alia* said:

"The last rule that need be stated is this: A con-
tract under the foregoing is not necessarily contrary
to the public policy of a state, merely because it
could not validly have been made there, nor is it one
to which comity will not be extended, merely because
the making of such contracts in the place of the
forum is prohibited, general statements to the con-
trary notwithstanding. In *Milliken* v. *Pratt* [125
Mass. 374, 28 Am. Rep. 241] *supra,* the court re-
marked substantially, even a contract expressly pro-
hibited by the statutes of the state in which the suit
is brought, if not in itself immoral (the term 'im-
moral' being used in the broadest sense), is not neces-
sarily nor usually deemed so invalid that the comity
of the state, as administered by its court, will refuse
to entertain an action under all circumstances to en-
force it. There must be something inherently bad
about it, something shocking to one's sense of what
is right as measured by moral standards, in the judg-
ment of the courts, something pernicious and in-
jurious to the public welfare. In Greenhood on Pub-
lic Policy at page 46, cited by counsel, the following
rule is deduced from the authority cited: 'When a
contract is valid under the public policy of the state
where made, it will be enforced in another state, al-
though the same would by the statute laws of the latter
state, be void, unless its enforcement would exhibit to

the citizens of the state an example pernicious and detestable.' ''

The dividing line between those contracts that will be enforced, though contrary to the statute or common law of the state, and those that will not be, is ''at the point where inherent harmfulness commences.'' The contract in the McAdam case was held to fall on the enforceable side of such line and the contract in the Fox case on the unenforceable.

We think, therefore, there is nothing in these cases that extends the limitations upon the general rule beyond those we have recognized.

We call attention also to *Union Trust Co.* v. *Grosman,* 245 U. S. 412, 62 L. Ed. 368, 38 Sup. Ct. Rep. 147 (see, also, Rose's U. S. Notes Supp.), where a married woman, domiciled in Texas, made, while temporarily in Illinois, a continuing guaranty of a note of her husband which was valid according to the law of Illinois but invalid and prohibited by the Texas law. Suit was brought in the United States court in Texas, which sustained the objection that its enforcement was contrary to the public policy of that state. The judgment was affirmed. The court said:

''It is extravagant to suppose that the courts of that place [the wife's domicile] will help a married woman to make her property there liable in circumstances in which the local law says that it shall be free, simply by stepping across a state line long enough to contract (citing The Kensington and other cases). There is nothing opposed to this view in those decisions in which the courts have enforced similar contracts of women domiciled where the law allowed such contracts to be made. It is one thing for a court to decline to be an instrument for depriving citizens belonging to the jurisdiction of their property in ways not intended by the law that governs them, another to deny its offices to enforce obligations good by the *lex domicilii* and the *lex loci contractus* against women that the local laws have no

duty to protect" (citing the McAdam and other cases).

The policy of a state to protect its married women in their property rights may perhaps be so strong that it will preclude judicial recognition of her contracts within the inhibited class, made during temporary absence from her domicile in a jurisdiction under whose laws such contracts are valid, but it does not extend to the point of justifying nonrecognition where the contract is valid by the *lex domicilii* as well as the *lex loci contractus,* unless it is vulnerable to the objection of immorality, etc., and this is, we think, the correct interpretation of this opinion.

Whether the requirement in favor of married women that their contracts square with the *lex domicilii* as well as the *lex loci contractus* is justified, in view of the policy prevailing everywhere in this country of enlarging women's political, property and personal rights, has been questioned. *International Harv. Co.* v. *McAdam, supra.* The Supreme Court, however, thought their emancipation not so complete that the common-law background of the Texas legislation could be ignored.

In a supplemental brief counsel called our attention to the Texas case of *Ayub* v. *Auto Mortgage Co.* (Tex. Civ. App.), 252 S. W. 287, decided by the Court of Civil Appeals, and the same case in the Supreme Court of that state. (Tex.) 266 S. W. 136. In the former it was held that a case of this precise sort contravened the public policy of Texas, and could not therefore be entertained, but the Supreme Court "was not prepared to give approval" to that proposition, finding it unnecessary, however, to discuss the question.

A case before Lord MANSFIELD in 1775 presented these facts: The plaintiff sold and delivered to the defendant at Dunkirk a quantity of tea with knowl-

edge that the purchaser intended to smuggle it into England where it was contraband. It was held that an action for the price of the tea lay in the English courts. Said the court in language frequently quoted:

"The objection, that a contract is immoral or illegal as between plaintiff and defendant, sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed; but it is founded in general principles of policy, which the defendant has the advantage of, contrary to the real justice, as between him and the plaintiff, by accident, if I may so say. The principle of public policy is this: *Ex dolo malo non oritur actio.* No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act. If, from the plaintiff's own stating or otherwise, the cause of action appears to arise *ex turpi causa,* or the transgression of a positive law of this country, there the court says he has no right to be assisted. It is upon that ground the court goes; not for the sake of the defendant, but because they will not lend their aid to such a plaintiff." *Holman* v. *Johnson,* 1 Cowp. 341, 98 Eng. Rep. 1120.

This case has been criticised as carrying the rule too far, as, in the American view, no doubt it does, but the language quoted is appropriate here. *Graves* v. *Johnson,* 156 Mass. 211, 32 Am. St. Rep. 446, 15 L. R. A. 834, 30 N. E. 818.

Cases can be found expressive of a doctrine that the term "public policy" as applied to contracts has a meaning larger than we have given it. It seems to us that some of them go to the point of holding that no contract will be enforced unless it is valid by the law of the forum as well as the *lex loci contractus,* which is a complete repudiation of the general rule.

The tendency of the later decisions is, we think, in line with the views here stated. This court has held valid a marriage contracted by Arizona residents in

New Mexico to evade a statutory provision (*Horton
v. Horton,* 22 Ariz. 490, 198 Pac. 1105) rejecting many
decisions to the contrary.

It may be that the ties of comity among the
states are or ought to be stronger than those between
nations (see, however, *Buckner* v. *Finley, supra*) but
none will argue that we should indulge a spirit of
captiousness against our neighboring republic.    With
it and its people our government and our people are
in constant governmental and commercial contact.
Citizens of the one country own property and trans-
act business in the other, and the course of trade is
growing.    It should be encouraged and fostered for
our mutual welfare.    Of those Mexicans with whom
we make valid contracts in this country we expect
faithful performance or the right to secure redress
through Mexican courts.    Adverse decisions on
grounds of policy will breed suspicion or discrimina-
tion against us.    We should be careful not to give
less than we expect to receive.    Elusive notions of
public policy, an unruly horse at best (*Hogston* v.
*Bell,* 185 Ind. 536, 112 N. E. 883), should not be an
obstacle to just claims.    If we are bound to hear one
plead his own wrong as a defense to just claims, let
us at least insist that our judicial consciences are
really shocked.

Is there then, applying this rule, anything inherently
wicked, vicious, or immoral in this sale?    Not unless
our *ipse dixit* makes it so.    It may be that our prohibi-
tion laws are expressive of our national moral sense
(*Rudolph* v. *United States,* 6 Fed. (2d) 487, 40
A. L. R. 1042, 55 App. D. C. 362), but their origin is in
our own experience.    Neither expressly nor by fair
implication do the laws condemn as inherently wicked
the age-old customs of other peoples in the use of
intoxicating liquors.

It would be difficult to justify such a position with
other nations.    Surely their views are not to be en-

tirely ignored, unless we are to consider ourselves the self-appointed censor of the morals of the world. The British, French or Italian merchant could scarcely appreciate a public policy that would enable an American tourist to plead that his purchase of wines and liquors, while enjoying the pleasures and protection of the foreign country, were so inherently wicked and vicious that he should not be ordered to pay therefor. Nor will the enforcement of this contract set an example pernicious or detestable to our people. On the contrary, we think it would be a matter of general surprise that an honest obligation might thus be avoided. The distinction between sales in this country and those in places where they might be legally made is readily appreciated and understood by the dullest.

Counsel argue by analogy that, if the slave trade, lotteries and contractual absolution from liability for negligence are inherently wicked and vicious, so also is the use of intoxicants. Slavery is universally condemned in the Christian world, of which we are a part, as a degrading and pernicious practice. Its prohibition in this country was by statute law, but at least one other nation had to its everlasting credit held this institution incompatible with free government and against its common law. Some *mala prohibita* are inherently harmful, and slavery is in that class. As to lotteries, there is a division of authority, as we have shown. They are gambling transactions, and may well merit the condemnation of the New Jersey court in the Watson case, *supra*. That they are universally regarded as pernicious, though sometimes resorted to in other countries, is generally known and accepted. It might be difficult to characterize stipulations against liability for negligence as inherently wicked and vicious, although there exists a well-established prejudice in many courts of this country against them. We are of course not con-

cerned with the propriety of disregarding contracts locally made or to be performed, but we do think it a strong thing to say, as the Wisconsin court said in the Fox case, *supra,* that the courts of the forum are justified in ignoring such contracts, though made and entirely performed in places where they are valid. The ties of interstate comity as understood in Wisconsin cannot be much stronger than those of international comity. The Wisconsin decision finds meager support in the case it mainly relied on (The Kensington), because, as we have already said, the contract there in question contemplated partial performance in this country. Nor would the opinion of the Wisconsin court in the later case of *International Harvester Co.* v. *McAdam, supra,* indicate that that court was entirely satisfied with its earlier decision. At any rate, there is very little analogy between the kind of contract involved in the Fox case and that here involved.

What we have said also disposes of the contention that there is a positive prohibition against sales of this kind. That expression is used in the cases to denote statutes like that construed in the Watson case, *supra,* which include in the scope of their condemnation, either expressly or by inference, the inhibited acts wherever be their occurrence.

The judgment is reversed, with instructions to overrule the demurrer and proceed in accordance herewith.

McALISTER, C. J., and ROSS, J., concur.