674

## In re MEXICAN–AMERICAN FRUIT & STEAMSHIP CORPORATION.

District Court, E. D. Louisiana. September 11, 1929.

No. 18658.

Terriberry, Young, Rault & Carroll, of New Orleans, La., for petitioner.

Single & Single and Carter, Ledyard & Milburn, all of New York City, and Dart & Dart, Deutsch & Kerrigan, and Brian & Brian, all of New Orleans, La., for claimants.

BORAH, District Judge. This is a petition filed by the Mexican-American Fruit & Steamship Corporation, owner of the steamship Yuma, for the benefit of the acts of Congress for limiting the liability of owners of vessels. The petition alleges that on March 5, 1926, the Yuma, with passengers, cargo, and mails on board, left New Orleans bound for Vera Cruz, Mexico; that she was under the command of an experienced master, was efficiently officered, manned, equipped, and supplied for the voyage, and was proceeding down the Mississippi river in charge of a compulsory pilot. At 7:20 p. m., when about 35 miles below the port of New Orleans, she went too far to starboard in the channel and touched her starboard bow against the west bank of the river; the blow, however, was merely a glancing one, and the vessel immediately came off into deep water and proceeded on her voyage. At the time of the collision, the master, the first mate, and the pilot were on the bridge, and there was a competent wheelsman at the helm, and the grounding was in no way due to any fault in the machinery, equipment, or construction of the vessel. Soundings were immediately taken, and the master went down into the forward holds and made an examination and thorough inspection and found the vessel was not taking any water whatever and that her bilges were dry; thereupon, the Yuma continued on her voyage, changed pilots at Pilot Town, proceeded through Southwest Pass, and crossed the bar at 3:10 a. m., March 6, 1926. Immediately after crossing the bar the master again went into the forward holds and there made a second thorough inspection and again took soundings, and as a result no damages were discovered, nor was water found to be in the bilges. At about 6:30 a. m., the vessel began to steer erratically. The master, who had been called to the bridge, ordered an examination made of the steering gear, and it was found to be in perfect order. Immediately afterwards the chief engineer came to the bridge and reported that the engines were racing at an unusual speed. The vessel was then observed to be down by the head. The master thereupon went down to the No. 1 hatch, removed the hatch covers, and discovered that there was five or six feet of water in the hold. The vessel was immediately turned around and headed back to Southwest Pass. The vessel's position at this time was about 35 miles south, 33 miles west of the end of Southwest Pass jetty. By 8:30 a. m., the Yuma had taken a list to port of about 30°. Jettison started and all available pumps were used. The water in the No.

1 hold was washing over the combings and flowing into the No. 2 hold. Shortly before 11:00 a. m. the water-tight door between the fire room and the No. 2 hold was lifted about one foot to permit water from the No. 2 hold to run into the fire room and from there to the circulating pump suction in the engine room. At 3:30 p. m. the vessel suddenly took a list from 30° port to 45° starboard, and the water in the engine room washed over the plates and put out the fires. At 4 p. m. the vessel was abandoned and all hands took to the boats. The steamship Yuma was a total loss, and nothing was saved from the wreck except a life boat valued at $200 and certain accessories to the value of about $200. In addition to these items, the freight earned amounted to $3,291.22 and the prepaid passenger moneys amounted to $250.

The petition further alleges that the loss, damage, injury, and destruction resulting therefrom were due to an inevitable accident or to an error in navigation or management of the vessel and were not caused or contributed to by any negligence or fault on the part of the petitioner, and were occasioned and incurred without privity or knowledge of the petitioner; that certain claimants have already instituted proceedings in the state court against petitioner for damages for loss of cargo; that there has been instituted in this court the claim of Mrs. Clara B. Morton for loss of certain personal effects and for personal injuries; furthermore, that the demands already made against the petitioner in behalf of the various claimants amount to more than $60,000. For the claims for damages that have been made or hereafter may be made, the petitioner as owner of the vessel claims exemption from liability for the losses, damages, injuries, and destruction occasioned or incurred by the collision and sinking aforesaid, and alleges it has valid defenses thereto on the facts and under the provisions of the contracts for the carrying of the cargo and passengers and their baggage.

The prayer of the petition is for the appraisal of the value of petitioner's interest in the vessel and her pending freight, for an order requiring the giving of a stipulation for the payment into court of the petitioner's said interest, for a monition to all parties having claims to come in and make proof thereof and answer, for a decree determining the liability of the petitioner and limiting its liability, if found liable at all, to the value of petitioner's interest in the vessel and her pending freight, for the distribution of its proceeds among the claimants if entitled thereto, and for an order restraining all suits pending the final determination of this proceeding.

Upon filing the petition, the ordinary proceedings ensued, which resulted in the presentation of the claims in suit, in which answers were filed on behalf of the various claimants. They denied many of the petitioner's allegations, and further answering averred:

That the said steamer Yuma was unseaworthy in that:

(a) Her shell plating on the bottom was rusted and corroded and weakened by age and wear and tear, and in an insufficient condition.

(b) Her riveting on the bottom plating was in a similar condition as above.

(c) An inspection of the Yuma in dry dock, prior to the loading of this cargo, had resulted in knowledge and privity of this condition to petitioner, and that petitioner nevertheless failed, neglected, and refused to follow certain recommendations and to make repairs necessary and incidental to the aforesaid condition, and permitted the steamer Yuma to lose her classification and to fail to be reclassified, but that with knowledge and privity, petitioner nevertheless permitted the said steamer Yuma to be held up to the public as in a seaworthy condition.

(d) The trim of the Yuma, and particularly the distribution of her cargo on this fatal voyage, was improper.

(e) The cargo of lard was loaded on deck improperly and without authority.

(f) The pumps of the Yuma were in improper working condition.

(g) The Yuma failed and neglected to deliver its cargo as contracted and agreed by petitioner, without lawful excuses therefor.

(h) Shortly after sailing, in spite of fair weather and smooth seas, the Yuma began to leak and become unmanageable, and was abandoned at sea, and subsequently became a total loss.

(i) In other respects the Yuma was unseaworthy, and petitioner had knowledge and privity thereof. * * *

Upon these issues it is apparent that the first question which arises for solution is to determine whether the vessel and her corporate owner are entitled to exemption from all liability.

■ Under the Harter Act (46 USCA §§ 190–195) the shipowner is not liable for any loss by reason of error in navigation or management, provided that the owner shall show that the vessel was in all respects seaworthy and properly manned, equipped, and supplied for the voyage; or, if this cannot be

established, that he has used due diligence to make her so. The discharge of this duty is not left to any presumption in the absence of proof. It is the condition precedent, compliance with which is required of the vessel's owner to give him the benefit of the immunity afforded by the act. International Navigation Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 21 S. Ct. 591, 45 L. Ed. 830; The Southwark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65; The Wildcroft, 201 U. S. 378, 26 S. Ct. 467, 50 L. Ed. 794.

It appears from the evidence that the steam vessel Yuma of 1,776 gross tons was built, not in accordance with classification rules, at Bremerhaven, Germany, in the year 1900, and was classed A-1 with the American Bureau of Shipping until August, 1925. In 1921 she was acquired by petitioner from the United States Shipping Board. On February 19, 1924, at the request of her owner, the Yuma was submitted for special survey, at which time she was surveyed by Roland Linfield of the American Bureau of Shipping and certain recommendations were made by the surveyor concerning repairs which he wished done before he would issue a classification certificate. This survey was never completed, as there were parts of the vessel which could not be examined at that time for various reasons shown in the report, and with reference thereto the surveyor recommended further detailed examination and inspection of the vessel on the occasion of her next dry docking. This survey was made only for classification purposes, and, though extensive repairs were recommended, the vessel was permitted to retain her class for a year of grace and was given a seaworthy certificate. This year of grace was extended several months, and finally the owner was required to withdraw the vessel from class because the recommended repairs had not been made. At the same time that Linfield executed this special survey, he also surveyed the hull of the vessel for a grounding which had occurred some nine days previous at San Blas. Repairs then recommended were executed to his satisfaction, and he declared in writing to the owner that the vessel was seaworthy. On November 14, 1924, Linfield again surveyed the vessel, again recommended repairs to the hull, boilers, and machinery, and again certified in writing to the owner, after the repairs had been completed, that she was a seaworthy vessel. On July 19, 1925, the vessel underwent a periodical docking survey, and once again Linfield declared in writing to the owner that she was seaworthy. On March 10, 1924, A. E. Wilson, surveyor

to the London Salvage Association, the vessel's insurers, issued a seaworthy certificate to the owner of the vessel, and on April 14, 1925, she was surveyed by Oscar Maessen, inspector of hulls and boilers, at the Panama Canal Zone and a seaworthy certificate was issued. It further appears that John Low, marine superintendent of the Mexican-American Fruit & Steamship Corporation, whose competency as a surveyor and estimator is not questioned, had seen the vessel in dry dock on the occasion of every survey made by Linfield and in his opinion she was a seaworthy vessel, as revealed by these surveys and inspections. David McNaughton, the port engineer, gave similar testimony. To further meet the burden placed upon it, petitioner produced the ship's officers, all of whom testified that the vessel was kept in good condition, that scaling and painting was constantly being done, and in their judgment the vessel was seaworthy. In fact, the evidence shows that as a result of every survey held she was pronounced by every surveyor who saw her as a seaworthy vessel and though several witnesses have testified that she was unseaworthy, no witness who had actually seen her has testified to that effect.

It also appears from the evidence that when the Yuma sailed from New Orleans on March 5, 1926, she was in command of a competent master mariner and was in every respect efficiently officered, manned, equipped, and supplied for the voyage. This is petitioner's evidence, and nothing has been offered to meet it.

The undisputed evidence also sustains the conclusion that the vessel collided with the west bank of the Mississippi river at a point opposite McCall flats. In testifying with reference thereto Capt. Pooley and others state that the act of the pilot in allowing the vessel to get too close to the west bank of the river was in their opinion an error in navigation. The facts unquestionably bear out this contention, in that the attempt of the pilot to avoid striking the bank failed even though his commands were answered promptly and properly, and the engines and helm worked perfectly. Claimants, however, insist that the touching of the bank could not possibly have been or was not in fact the proximate cause of the vessel's loss; but this view does not represent my appreciation of the evidence. In this connection, it is rather significant to observe that though a number of witnesses have testified that the vessel touched lightly on a soft mud bottom, no witness having the prerequisite knowledge has stated

that there was not some hard object imbedded in the mud at the exact point where she touched. If the vessel had struck something of this sort, it could have ripped her bilge heel off, indented her plates, or caused the very thing that happened in this case. Be this as it may, the better reasoned testimony in this case is to the effect that a seaworthy vessel can go aground on a soft mud bank with no appreciable force apparent to those on board and still suffer damage to the extent of opening up her seams. While it is true that the vessel did not open up immediately after grounding, those who by experience and observation are most qualified to express themselves have stated that it is possible under the circumstances for mud or clay to clog up the opening and stay there until the ship reaches open water and begins to work in the seaway.

Considering these facts and all the other surrounding facts and circumstances of the case, I am persuaded that the evidence sustains the account set forth in the petition as recited above. I find the vessel was seaworthy and properly manned, equipped, and supplied for the voyage; that the touching of the bank, which was an error in navigation or management of the vessel, was the proximate and efficient cause of her loss. Accordingly, her owners are entitled to the protection which the Harter Act affords. This determination, however, affects only the cargo claimants and has no applicability to the claim of Mrs. Clara B. Morton for injuries to passengers, and claims for loss or damage to their personal baggage not shipped as merchandise and not paying freight are not within the exemptions of the first clause of the third section of this act (46 USCA § 192). Moses v. Hamburg-American Packet Co. (D. C.) 88 F. 329, aff'd (C. C. A.) 92 F. 1021; The Rosedale (D. C.) 88 F. 324, aff'd (C. C. A.) 92 F. 1021. See The Kensington, 183 U. S. 263, 22 S. Ct. 102, 46 L. Ed. 190.

The remaining question for solution is whether or not petitioner is entitled under 46 USCA § 183, to limit its liability. The findings heretofore reached by me preclude the necessity of further rehearsing the evidence on this branch of the case, for it is clear that the loss, damage, injury, and destruction resulting from the collision were not caused or contributed to by any negligence or fault on the part of petitioner, but were occasioned and incurred without its privity or knowledge.

There will be a decree sustaining the petition and dismissing the cargo claims.